**In re PACIFIC HOMES, a California nonprofit corporation, also dba Asbury Pharmacy, Claremont Manor, Casa De Mannana, Desert Crest, Fredericka Manor, Kingsley Manor, Pohai Nani, Wesley Palms, Sparr Convalescent Hospital, and La Jolla Convalescent Hospital, Debtor.**

**Bankruptcy No. 77–01667–JM.**

United States Bankruptcy Court, C. D. California.

April 16, 1982.

Kadison, Pfaelzer, Woodard, Quinn & Rossi, Los Angeles, Cal., Gen. Counsel.

Stutman, Treister & Glatt, Los Angeles, Cal., Sp. Counsel.

O'Melveny & Myers, Los Angeles, Cal., for Residents' Committee.

Memel, Jacobs, Pierno & Gersh, Los Angeles, Cal., Counsel to Trustee.

Richards, Watson, Dreyfuss & Gerson, Los Angeles, Cal., for Western and Southern Life Ins. Co.

E. D. Yeomans, Los Angeles, Cal., Zissu, Berman, Halper, Barron & Gumbinger, New York City, for the Mutual Ben. Life Ins. Co.

Title Ins. and Trust Co. and Latham & Watkins, Los Angeles, Cal., for Indenture Trustees.

Johnsen, Manfredi & Thorpe, Los Angeles, Cal., Sp. Counsel for Residents' Committee.

Earle Hagen, Encino, Cal., for Creditors' Committee.

MEMORANDUM ALLOWING FINAL FEES AND EXPENSES FOR THE TRUSTEE, COUNSEL, AND ACCOUNTANTS FOR THE PERIOD ENDING AUGUST 31, 1981

JAMES E. MORIARTY, Bankruptcy Judge.

This debtor proceeding was filed on February 18, 1977, under Chapter XI of the

former Bankruptcy Act (11 U.S.C. Section 701, *et seq.*). The debtor was permitted to remain in possession and operate the seven retirement homes and related facilities. No Receiver was appointed until November, 1977, the last month of operation under Chapter XI. In December, 1977, this case was converted to a proceeding under Chapter X of the Bankruptcy Act.

It is not the purpose of this Memorandum to go into great detail regarding the facts and events that led to the filing of this debtor proceeding since this has been thoroughly covered by the Report of the Trustee pursuant to Section 167 of the Bankruptcy Act (11 U.S.C., Section 567). The Court believes that a brief mention of some of the pre-bankruptcy events is necessary to fully understand the great task the Trustee and his counsel had to face and to resolve to bring Pacific Homes back to a viable financial position.

Notwithstanding the fact that Pacific Homes is a California nonprofit corporation, it has at all times since its inception been referred to and advertised as an agency of the United Methodist Church and its Pacific and Southwest Annual Conference (hereinafter "Annual Conference"). For approximately 25 years prior to the filing, on February 18, 1977, Pacific Homes was in financial difficulty and in the latter years suffered operating deficits. The Board of Directors of Pacific Homes was composed of ministers and lay members of the Annual Conference.

Operating retirement homes and convalescent facilities is not the same as running a church or an ordinary business, and it is evident from the continued deficit operation that neither the Board of Directors nor the Annual Conference knew how to deal with the problem. One of the most shocking events was the sale of life-time care contracts for amounts ranging up to $100,-000 and not establishing adequate reserve accounts for these monies to pay for the future cost of the care of the life-contract residents.

The monies from the life contracts were not used to purchase investments such as Treasury bills or to deposit the monies in long-term savings accounts. Instead, it was used to pay current operating costs and for much-needed upgrading of the facilities then in operation. An expansion program was undertaken. The most costly of these projects was the purchase of the Knickerbocker Hotel in Hollywood, California. This acquisition in 1963 was for the purpose of providing low-cost housing to the elderly. This activity was not successful, and in 1965 this property was sold in a transaction that eventually caused Pacific Homes losses in excess of $3 million as established by the accounting firm of Arthur Young & Co.

At the time of filing there were five (5) major secured creditors holding liens on certain of the real property owned by the debtor. The total of these liens was approximately $22 million.

Included in the liens was one held by Mutual Benefit Life Insurance Company in the sum of $6 million. The circumstances surrounding this loan are unusual and deserve mentioning. In mid-1976, the debtor sought an informal arrangement with its trade creditors through the office of the Credit Managers Association of Southern California. A Plan was worked out to pay the trade creditors a 50 percent (50%) dividend on a total debt of approximately $800,000.

To fund the informal arrangement and other financial requirements of continuing to operate its business, the debtor made arrangements to borrow $6 million from Mutual benefit and said loan was approved in September, 1976, approximately five (5) months before the filing of this debtor proceeding. From the proceeds of the loan, $4 million was placed on deposit in a bank in Phoenix, Arizona, in the name of the Annual Conference, and the balance was used by the debtor to pay accumulated bills, including the $400,000 to the trade creditors mentioned above.

The Court has often wondered how any loan officer could have approved this loan and disbursed the money and whether even the slightest inquiry had been made into the financial condition of the debtor. It had no

demonstrable ability to service this loan. Although the lender had a guarantee from the Annual Conference, what legitimate business enterprise wants to sue a church? The extent of its available assets was quite uncertain. Although Mutual Benefit received a trust deed on Fredericka Manor, located in Chula Vista, California, and it was supposed to receive a trust deed on two (2) commercial buildings located at 5250 and 5300 Santa Monica Boulevard, Los Angeles, California, it did not receive a valid, effective trust deed on the office buildings. Yet the full proceeds of the loan were disbursed on behalf of the debtor. Indeed, five (5) months later, when this proceeding was filed, the condition to the effectiveness of the Mutual Benefit trust deed was still not satisfied.

On May 5, 1977, the debtor in possession filed an application to sell the two (2) commercial buildings on Santa Monica Boulevard and the Court, on June 3, 1977, approved the sale. Notwithstanding the fact that Mutual Benefit's trust deed was not effective against the debtor in possession (or a trustee), it attempted to recover part of the proceeds for these sales. Claims to the proceeds of sale were also sought by Title Insurance and Trust Co. as trustee and by Connecticut General Life Insurance Company and PMIF as beneficiaries under the Pacific Homes Trust Indenture, as amended. Litigation commenced immediately after the conversion of this proceeding to a Chapter X. The Court ruled that Mutual Benefit was not entitled to any of the proceeds from the sale of the Santa Monica Boulevard property and permitted the Trustee to use the sales proceeds. Appeals followed, and eventually agreements were reached resulting in dismissal of the appeals and provisions for payments to commence to the secured creditors.

When there is an operating case under Chapter XI, with a debtor in possession, counsel for the debtor in possession is generally looked to as the person to perform many of the services generally rendered by a Trustee or a Receiver. While the business of the debtor did continue, so did the deficit operation.

Had this been an ordinary business operation, it would likely have been closed down shortly after filing since the debtor was unable to pay its current bills. The Court elected not to close down the operation for the reason that such action would have created a severe hardship on the 1800 elderly residents, many of whom had paid substantial sums for what they thought would be a life-time of care. Further, the Court hoped and prayed that the Annual Conference would recognize its moral and legal obligation to the residents and take steps to correct this major problem. During the approximately nine (9) months of operation under Chapter XI, the monthly deficit was in excess of $300,000, excluding debt service.

On September 27, 1977, the debtor filed its Plan of Arrangement and a hearing on the Plan was set for November 4, 1977. The Plan presented many problems, the most important of which was whether the funds available made the Plan feasible. The Annual Conference was to contribute $9 million, which sum was to be reduced by $1.2 million, representing monies advanced by the Annual Conference to Pacific Homes during the Chapter XI operation.

The interest on the secured obligations was accruing at approximately $2.5 million per year, and this presented an unworkable burden for the reconstituted debtor. The table on the subsequent page will give some insight into this problem.

### PACIFIC HOMES

### SECURED DEBT ANALYSIS

#### ($ MILLIONS)

| Creditor | Debt Owed 12/77 | Debt Owed 12/79 | Debt Owed 10/81 | Notes |
|---|---|---|---|---|
| Western & Southern | 3.6 | 4.0 | 1.3 | 1 |
| Mutual Benefit | 6.5 | 7.8 | 8.0 | 2 |
| Conn. General | 6.7 | 7.7 | 0.0 | 3 |
| PMIF Bonds | 4.8 | 5.3 | 3.3 | 4 |
| State California Fire Loan | .7 | .8 | .9 | 5 |
| Total | $22.3 | $25.6 | $13.5 | |

NOTES:

1. Originally secured by Pohai Nani and Wesley Palms; now only Wesley Palms. Scheduled to be paid in full by 12/31/85 per original schedule.

2. Secured by Fredericka Manor. Originally guaranteed by PSWAC—released. Scheduled to be paid in full by 12/31/2006, the original schedule date.

3. Originally guaranteed by PSWAC. Satisfied in full during Chapter X.

4. Secured by all Pacific Homes property. Brought current and scheduled to be paid in full by 12/31/88, per original schedule.

5. The loan for fire alarm improvements was secured by all Pacific Homes property in California. Scheduled to be paid in full by 12/31/2005. In addition, the State claimed a substantial, but uncertain, claim for deficient funding of life-care contract reserves. This claim was eliminated by the Plan of Reorganization.

On the date of the hearing on the confirmation of the Plan, numerous objections were pending, and counsel for the debtor advised the Court that the debtor would not seek approval of the Chapter XI Plan of Arrangement. Counsel then filed appropriate papers to convert this proceeding from Chapter XI to Chapter X of the Bankruptcy Act (11 U.S.C., Section 501, *et seq.*).

A hearing on the motion to convert from Chapter XI to Chapter X was set for December 9, 1977, before the undersigned. An appropriate notice was sent to all creditors and interested parties.

On November 11, 1977, this Court appointed Richard E. Matthews as Receiver in the Chapter XI proceedings and he qualified by the posting of an appropriate bond.

On December 9, 1977, the motion was granted converting this case to one under Chapter X of the Bankruptcy Act. On the same date United District Court Judge Hauk entered an order in which he directed this Court to hear and determine all matters. Pursuant to that established policy, this Court has heard and determined all interim fee applications and will do the same in determining final fee applications which are the subject of this Memorandum.

Also on December 9, 1977, Orders were entered appointing Richard E. Matthews as the Chapter X Trustee and employing the law firm of Kadison, Pfaelzer, Woodard, Quinn & Rossi as General Counsel to the Trustee and the law firm of Stutman, Treister & Glatt as Special Bankruptcy Counsel to the Trustee.

The special qualifications of Mr. Matthews and these two law firms will be elaborated on in subsequent portions of this Memorandum Opinion when their fee applications will be discussed. At the outset Mr. Matthews was faced with many operational and fiscal problems. The most important of these were to maintain the occupancy rate, to operate the facilities on a cash, break-even or better basis, and to bring the secured or long-term debt within a realistic level that could be paid off on a regular basis without endangering the operation of the retirement homes and related activities.

After much study and consultation, the Trustee determined that certain facilities should be sold since they did not fit into the reorganization of the debtor. Since most of the retirement homes were located in California, it was determined that the Desert Crest Retirement Home and related facilities located in Phoenix, Arizona, and the Pohai Nani Retirement Home and related facilities located in Kaneohe, Hawaii, be sold. These two sales were approved by the Court. Later, the smaller Sparr Convalescent facility, located in Los Angeles, and certain surplus property at Kingsley Manor in Los Angeles, and at Fredericka Manor in Chula Vista, California, were also sold.

From the proceeds of these sales the secured or long-term debt was reduced from approximately $22.3 million to $13.5 million. One trust deed holder, Connecticut General Life Insurance Company, was paid in full when it waived $1.8 million in interest. The balance owed to Western & Southern Life Insurance Company will be paid off by the end of 1985. The other secured creditors will be satisfied according to the Trustee's Plan.

With the stabilization of Pacific Homes business, the reduction of the long-term debt and the settlement of the Trustee's actions and the *Barr* and *Trigg* class actions brought in other courts against the Annual Conference and others, which will produce contributions totaling $21.0 million from the

Annual Conference, the Trustee was in a position to propose a Plan of Reorganization. On March 31, 1981, the Trustee filed the Plan of Reorganization.

The Securities and Exchange Commission filed its Report on the Plan, and several objections to the Plan were filed by creditors. After a series of hearings the Plan was modified; and finally on September 2, 1981, the Plan of Reorganization was approved. No appeal was taken from this Order.

On September 22, 1981, this Court approved the new, independent Board of Directors for Pacific Homes. On October 1, 1981, the Trustee revested the Board of Trustees with the assets of the debtor, except such sums as were needed to pay dividends to creditors pursuant to the Plan and all administrative expenses, including the fees allowed herein.

Because of the nature of this case and the claims filed herein, a number of objections to the amounts of some claims was necessary. This has been accomplished, and checks have been issued to all creditors entitled to receive dividends pursuant to the Plan.

The only task remaining for the Court is to determine the final fees to be allowed for administrative, legal and accounting services from the inception of this proceeding on February 18, 1977, to August 31, 1981. Some services were performed by some of the applicants after August 31, 1981, but full payment has been made for those services.

*The Law and General Discussion*

This part of the Memorandum will discuss the factors and legal principles that should be taken into consideration in awarding the final fees.

On December 20, 1977, the Trustee filed an application to establish a schedule for the payment of interim fees and this matter was set for hearing on February 3, 1978. At that hearing the Court approved an interim fee of $7,500 per month for the Trustee; legal fees of $90 per hour for partners

or shareholders in law firms retained by the Trustee; $65 per hour for associates; and $25 per hour for paralegals.

On February 24, 1978, a second application regarding interim fees was filed to permit payments to the counsel for the Residents' Committee and the accountant, Arthur Young & Co. A hearing on this application was held on March 27, 1978. On that date the Court approved interim payments to counsel for the Residents' Committee at the same rate as set forth above and for interim payment to Arthur Young & Co. at the following rates: Partners/directors $70.00 an hour; principals/managers $50.00 an hour; senior staff $30.00 an hour; assistant staff $20.00 an hour; and clerical staff $7.00 an hour.

On April 23, 1980, an Order was entered effective June 1, 1980, increasing the interim fees to $8,000 a month for the Trustee; $110.00 an hour for legal partners or shareholders; $80.00 an hour for associates; $30.00 an hour for paralegals; accountants-partners/directors $85.00 an hour; principals/managers $60.00 per hour; senior staff $35.00 per hour; assistant staff $25.00 per hour; and clerical staff $8.00 per hour.

Throughout these proceedings twenty-one (21) hearings on interim fee applications were held.

■ In considering the allowances of final fees, the Court will take into consideration the following factors:

1. The time and labor required;

2. The novelty and difficulty of the question;

3. The skill requisite to perform the services required;

4. The preclusion of other employment due to the acceptance of the assignment in the case;

5. The customary fee for similar services;

6. Whether the fee is fixed or contingent;

7. Time limitations imposed by the client or other circumstances;

8. The amount involved and result obtained;

9. The experience, reputation and ability of the party providing the services;

10. The undesirability of the case;

11. The nature and length of professional relationship with the client;

12. Awards in similar cases.

See *Matter of First Colonial Corporation of America*, 544 F.2d 1291 (5th Cir. 1977).

To say that this was an unusual case is putting it mildly. During the almost 20 years the writer has served the Bankruptcy Court, he has handled many large and complex cases, cases involving many times the assets and liabilities involved in this case; but how does one place a dollar value on the well being and even the lives of 1,800 elderly persons?

This Court may be old fashioned, but it believes that there is more to life in general than a mere dollar sign. In our modern commercial world, many persons seem to have lost sight of the well-being of our fellow man.

In this case the Trustee, his counsel, and counsel for the Residents' Committee took a hopelessly insolvent operation and by hard work and skill in a very novel situation and over persistent and aggressive opposition converted it into a solvent, ongoing operation that should, under the new Board of Directors, be able to continue to provide these much-needed services to the community.

As noted above, this Court has handled many large and complex cases as well as thousands of small and consumer cases. The Court does not believe that in awarding fees in these many matters it has the reputation of being too generous in disbursing monies belonging to the estates or the creditors. In this case the Court had a very active role and is well aware of the services performed by the fee applicants; and in making the awards herein the Court will continue to make every effort to be fair to the applicants, the debtor estate and its creditors.

Pursuant to Section 208 of the Bankruptcy Act (11 U.S.C., Section 608), the Securities and Exchange Commission is a statutory participant in Chapter X proceedings. The S.E.C. has furnished the Court with a report on the fee applications herein, and the Court is appreciative of this effort on behalf of S.E.C.

The Court may grant, but is not required to grant, particular deference to the views expressed by the S.E.C. concerning fees to be awarded or expenses to be paid. See *In re Westec Corporation*, 313 F.Supp. 1296, 1302 (S.D.Tex.1970); *In re Philadelphia Reading Coal & Iron Co.*, 61 F.Supp. 120, 124 (E.D.Pa.1945); *In the Matter of Polycast Corporation*, 289 F.Supp. 712, 722 (D.Conn.1968); *In re Yuba Consolidated Industries, Inc.*, 260 F.Supp. 930 (N.D.Cal.1966); and *In re Liberty Baking Corporation*, 189 F.Supp. 27, 30 (S.D.N.Y.1960).

In the past, this Court in prior fee memoranda has devoted many pages citing and discussing cases dealing with certain aspects of awarding fees and expenses, such items as time records, economy in bankruptcy administration, and the oft repeated phrase that fee applicants in a bankruptcy proceeding should not expect the same compensation as they would receive from a private, solvent client. Most of these principles still apply and will be used in determining the allowances in this case.

Recently, however, there have been a number of cases wherein the fees allowed, particularly in complicated and successful cases such as this one, relate more closely to the prevailing rates charged to nonbankruptcy clients. These decisions may have been influenced by the enactment of the New Bankruptcy Code.

Section 330(a)(1) of the Bankruptcy Code (11 U.S.C., Section 330) provides as follows:

"(a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney.

(1) reasonable compensation for actual, necessary services rendered by such trus-

tee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional person employed by such trustee, professional person, or attorney, as the case may be, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title;"

The cases discussed below were all filed under the Bankruptcy Act and before the Bankruptcy Code became effective on October 1, 1979. In the case of *Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088 (5th Cir. 1980), the Court not only allowed the prevailing hourly rate to counsel, but an amount in excess of the hourly rate as an "enhancement" for the good results achieved.

In the case of *Westgate-California Corporation* and four (4) related cases in the Southern District of California (an unreported case), the Court not only allowed the prevailing rates, but substantial "bonuses" or "enhancement." The S.E.C. in its report in these cases recommended the prevailing hourly rate plus a modest "enhancement."

The *Westgate* cases involved the financial empire of C. Arnholt Smith and billions of dollars. There is no question that the trustees and counsel in that case did an outstanding job. No appeal was taken from the order awarding fees in these cases.

Recently the Ninth Circuit in the case of *In re THC Financial Corporation v. J. Carl Osborne*, 659 F.2d 951, recognized that for excellent work a fee applicant may be paid a rate similar to the private rates charged in a complicated, successful case.

There is one problem, however, that is present in many of the fee applications, and that is the claim for time spent in preparing the fee applications. The only case known to the Court that even supports a partial allowance of this charge is the case of *Rose Pass Mines, Inc. v. Howard, supra*. There are numerous cases that have not approved the allowance of this item in a fee application. They include *In re Imperial "400" National Inc.*, 432 F.2d 232, 239 (3rd Cir. 1970), and *United States Larchwood Gardens, Inc.*, 420 F.2d 531, 534 (3rd Cir. 1970).

See also *In the Matter of R. Hoe & Co., Inc.*, 471 F.Supp. 493, 512 n.49 (S.D.N.Y.1978), and *In the Matter of the New York, New Haven & Hartford Railroad Company*, 421 F.Supp. 249 (D.Conn.1976). This latter case was appealed to the Court of Appeals and eventually to the United States Supreme Court, but the issue of reimbursement for the preparation of fee applications was not one of the issues on appeal.

The Southern District of New York and the Central District of California handle more reorganization cases, both large and small, than any other districts; and in neither district are allowances made for time spent in the preparation of fee applications and appearances in court in support thereof. This Court is unaware of any ruling by either the Second Circuit Court of Appeals or the Ninth Circuit Court of Appeals allowing such claims.

■ This Court has made many allowances in the last nineteen years and has never knowingly approved allowances for time expended relating to the preparation of fee applications or appearances in court in support thereof. Accordingly, in determining a fair and reasonable fee to be paid to the applicants, no consideration will be made for such time expended.

## FEE APPLICANTS

### RICHARD E. MATTHEWS, TRUSTEE

■ The Trustee has filed his final fee application for the period of time covering his initial appointment as Receiver on November 11, 1977, and his appointment as Trustee on December 9, 1977, to and including August 31, 1981. This covered a period of three years and ten months. Mr. Matthews seeks a final fee of $800,000 of which $341,500 must be credited as previously paid on interim fee applications, leaving a balance of $458,500.

Prior to his becoming active in this debtor proceeding, Mr. Matthews operated his own business consulting firm. From the material Mr. Matthews furnished to the Court, it appears that for the four years preceding

this assignment his average income had been approximately $150,000 a year. This Court is well aware of the explosion in professional fees that occurred in the late 1970's, since such increases have been reflected in all fee applications the Court has received.

Upon acceptance of this assignment, Mr. Matthews had to terminate his consulting business. On his appointment as Receiver on November 9, 1977, he and the law firm of Stutman, Treister & Glatt spent a very hectic month leading up to the Chapter X conversion in an attempt to investigate the many basic problems plaguing Pacific Homes.

The Court has previously discussed some of the problems that the Trustee and his counsel faced. One of the finest jobs performed by the Trustee was the developing of a realistic marketing program, without which the debtor's operation could not have been revived. At the time Mr. Matthews became Trustee the census of residents was on the decline. No new residents had been admitted in over a year. The spectre of a bankruptcy proceeding discouraged many new residents from applying, and the residents at that time were embarassed and unhappy. Many residents threatened to leave; some had left.

The first thing Mr. Matthews had to do was to convince the residents that he was there to help them and to provide competent management, which had not been done in the past. After meetings were held with key residents from each home, a general meeting was held at each home to explore as many problems as possible. This Court attended all such meetings at the retirement facilities in California and the response of the residents was most gratifying. The primary desire of these elderly persons was to meet with someone to tell them the truth, and to have some hope for the future. Mr. Matthews filled this much-needed void, and most of the residents became active and were supporters of the Trustee.

When Mr. Matthews became Trustee, there was no main office staff except the Treasurer. However, with some professional help he was able to put together a successful marketing program that has brought in over 1,100 new residents. The census of residents at Pacific Homes rose from 63% in February of 1977 to 82% in July of 1981 and is projected to reach in excess of 90% in the next few years. Without this increase, Pacific Homes could not sustain its operations.

Much more could be written about the many things Mr. Matthews was able to accomplish as soon as funds from the sale of some of the properties described above became available. The much-needed repairs and refurbishing of the facilities, and a new resident getting freshly painted living quarters as part of the inducement to enroll held top priority. As soon as funds were available the Trustee began making monthly payments to most of the secured creditors in amounts less than the liens provided. Only Mutual Benefit failed to agree with such an arrangement which resulted in their loss of approximately $100,000. Again, the Court finds it hard to understand the business thinking of this creditor.

One of the great services performed by the Trustee was cooperation and support of the class action filed by the residents against the United Methodist Church and its constituent agencies. While the Trustee was not a named party in the class action in the Superior Court of the State of California for the County of San Diego entitled, *Frank T. Barr, et al. v. The United Methodist Church, et al.*, he and his General Counsel met with counsel in the class action and provided them with exhibits and other valuable information.

General Counsel monitored this lengthy litigation, and the Trustee and his General Counsel initiated their own action and conducted meetings with church representatives that eventually paved the way for the settlement of this litigation which produced $21 million for this debtor estate. Superior Court Judge James L. Focht, in his findings approving the settlement, made the following statements:

"I wish to congratulate all who have had a role in putting together this complex

settlement. It has been a difficult task.... It is a very complex settlement. It is innovative; it is imaginative; it is unique. Because of its unique structure, the plaintiff classes will receive far more in economic benefits, according to at least respectable projections, than the actual cash payment of $21 million because it is foreseeable, and it is the Trustee's present opinion that downstream the revitalization of Pacific Homes will ultimately result in benefits that are over and above the full cash involved.... I should add and commend the extent to which counsel for plaintiffs have been able to and have in fact worked closely with the Trustee. The close and harmonious working relationship with the Trustee has been essential to accomplish what we have accomplished thus far. I might add that I have been very, very favorably impressed with the activities of the Trustee and with the Trustee as an individual during the many hours in which he was on the witness stand."

Some reference has been made to the fee paid to the Trustee in the case of *Equity Funding*. This Court served as Special Master in the *Equity Funding* matter, although it played no role in the determination of the Trustee's fee. In that case the Trustee served for approximately three and one-half years and was paid a monthly interim allowance of $12,500. He sought and was paid a total fee of $1 million, or a yearly average in excess of $285,700.

It must be remembered that *Equity Funding* was a large business conglomerate with assets and liabilities in the range of three quarters of a billion dollars. It was one of the largest fraud cases ever before the bankruptcy courts wherein seventeen former officers of the debtor either pleaded guilty or were convicted of criminal offenses.

While the Trustee in Pacific Homes faced and resolved many delicate problems, it would be unfair to compare his activities with those of the trustee in *Equity Funding*. Robert J. White, Esquire, of the law firm of O'Melveny & Myers, served as coun-sel in both cases, and the comments in his Objections of Residents' Committee to Final Fee Applications are most appropriate.

On the basis of Mr. Matthews having devoted his full time for 3.8 years to this case, his average yearly salary would be $210,526.31; and on the basis of having devoted 7,705 hours to this assignment, his hourly rate would be $103.83. The Court has gone through no less than ten computations to arrive at a fair fee, whether it be on an hourly or yearly basis. The Trustee is allowed a total fee of $690,000, from which must be deducted the sum of $341,500, leaving a balance due of $348,500. All expenses incurred by the Trustee, totaling $13,269.97, have previously been paid.

### KADISON, PFAELZER, WOODARD, QUINN & ROSSI

#### *General Counsel*

This law firm was appointed General Counsel to the Trustee on December 9, 1977. Over the years they appeared in a number of bankruptcy matters including *Equity Funding*. However, they do not claim to be specialists in the field of bankruptcy. They were employed because they were recognized as an outstanding law firm which specializes in all phases of commercial and business litigation and labor law.

With the many business and administrative problems facing the Trustee, this is the type of law firm the Trustee and this estate required. The Trustee, General Counsel and Special Bankruptcy Counsel formed a good working unit. The successful conclusion of this case is evidence of their combined efforts.

General Counsel seeks a final fee of $950,000, including $568,561.50 previously received on 22 interim fee applications, leaving a balance of $381,438.50. All expenses incurred have been paid.

Earlier in this Memorandum reference was made to the sale of five parcels of property. While the Court approved orders for the sale of five parcels of property, none of the surplus property at Fredericka Manor was actually sold by the Trustee. The

gross proceeds of the properties sold were as follows:

| | | |
|---|---|---|
| Kingsley Manor | $ | 800,000 |
| Sparr | | 425,000 |
| Desert Crest | | 3,250,000 |
| Pohai Nani | | 9,000,000 |
| Total | | $13,475,000 |

The Kingsley Manor and Sparr properties were sold through a real estate broker. However, due to the complexities in connection with the sale of Desert Crest and Pohai Nani, long and detailed negotiations by the Trustee and his counsel were necessary to find a suitable buyer who could assume the ongoing operations and pay the price sought by the Trustee. By proceeding in this fashion, brokerage commissions of approximately $612,500 were saved for the benefit of the estate.

When this case was filed, current and adequate records did not exist. The Trustee and counsel found that this presented a difficult problem in making accurate projections as to the progress being made. More importantly, such records were necessary in preparing the Trustee's 167 Report. This difficult task was accomplished by clerical help under the direction of paralegals.

Since General Counsel represented the Trustee in many ongoing business problems, they met frequently with individuals and groups of residents. From these many meetings a spirit of trust and cooperation developed which was very beneficial to the estate.

The fee application of General Counsel covers over 50 pages of narrative and an equal number of pages of exhibits that fully disclose the many activities undertook by them. The Court is well aware of the key role the Kadison firm played in the success of this debtor proceeding.

Among the business decisions which the Trustee faced shortly after his appointment was whether or not to reject the collective bargaining agreements which had been made by prior management and the unions representing employees at the various facilities operated by Pacific Homes. The expertise of General Counsel in the field of labor law was of great assistance in analyzing the problems involved and recommending solutions. Since rejection of the existing agreements would have been disruptive to the security of the residents and expensive to the debtor estate, it was determined that the Trustee should attempt to negotiate new, collective bargaining contracts with the various unions.

General Counsel negotiated with a number of unions which resulted in reaching satisfactory collective bargaining agreements for the years 1978 to 1980. Counsel had to deal with several local labor unions at different locations of Pacific Homes and to coordinate each contract so that a uniform policy could be established.

In 1980 new agreements were negotiated covering the period from 1980 to 1983. In the provisions of these agreements, all of the main objectives sought by Pacific Homes were obtained. Counsel handled these problems in a very professional manner, resulting in no disruption to the ongoing business of the debtor.

One creditor suggested that this labor relation work may have overlapped the legal services of Memel, Jacobs, Pierno & Gersh. This allegation is incorrect. The Kadison firm dealt primarily with labor relation problems. The Memel firm dealt with problems relating to licensing, operating, and compensating the debtor and residents pursuant to federal and state health and welfare laws and certain private health insurance policies.

This applicant expended 9,707.2 hours in this case, of which 836.5 hours totaling $59,198.80 were spent in preparing 22 interim fee applications, the final fee application, and time in court in support of said applications. The applications filed were complete in all respects and the cost was substantially more than that of any other fee application. As noted on page 17 of this Memorandum, no allowance is permitted for this item and this amount will be deducted in determining the total fee allowed.

After deducting the sum of $59,198.80, the Court has determined that the adjusted

final fee to General Counsel shall be the sum of $832,400. From this amount the sum of $568,561.50 previously received must be deducted, leaving a balance due of $263,838.50. Applicant has been paid all expenses incurred totaling $44,196.98.

## STUTMAN, TREISTER & GLATT

### Special Counsel to the Trustee

■ This law firm was appointed Special Bankruptcy and Corporate Reorganization counsel to the Trustee on December 9, 1977. Previously, it had been appointed counsel for the Creditors' Committee under Chapter XI on April 11, 1977, and as counsel for the Chapter XI Receiver on November 8, 1977. These matters will be dealt with separately below.

Since its inception over 35 years ago, the Stutman firm has specialized in bankruptcy matters, insolvency, debtors' and creditors' rights, and corporate reorganization. In the legal community of Los Angeles and the State of California, this firm is considered to be one of the best. Their service in this most unique case was certainly of the highest level.

The fee application filed in this proceeding seeks a final fee of $985,000, of which the applicant has received the sum of $458,311.25 as interim fees, leaving a balance claimed of $526,688.75. This covers 5,996.25 hours of service applicant performed in this case, including 186.50 hours spent on twenty-two interim fee applications and this final fee application. The value of the time spent in preparing fee applications is $25,157.50. Applicant also seeks reimbursement of expenses in the sum of $3,209.16 not previously paid.

On the date they were appointed Special Counsel, they filed an adversary proceeding to gain release of the proceeds from the sale by the Chapter XI debtor of the two commercial pieces of properties located at 5250 and 5300 Santa Monica Boulevard, Los Angeles, California. After a hearing, the Court held that the Trustee could use these funds to meet emergency expenses. The Court also held that Mutual Benefit did not have a valid lien on these properties.

PMIF, Connecticut General Life Insurance Company, and Mutual Benefit Life Insurance Company filed appeals. While the appeals were pending, Special Counsel sought to settle these matters. A complete agreement of all the parties was not reached. However, out of these discussions developed separate agreements and a program to pay lienholders monthly payments less than the scheduled amounts. As noted above, Mutual Benefit declined at first to participate in this program.

Adversary proceedings "D", "E", and "H," involving the properties at Desert Crest, Kingsley Manor, and Sparr Convalescent Hospital, were filed to determine the disposition of the proceeds of sale from each of the properties. When each lienholder attempted to obtain as much as possible of the proceeds, the battle began. Lengthy briefs were filed by all parties, and the hearings were extensive. Even some lienholders who did not hold direct liens on the properties involved intervened, since they viewed this action by the Trustee as a possible threat to liens they held on other properties owned by the debtor.

Special Counsel also became engaged in representing the Trustee in a number of adversary proceedings by and against some of the residents at the various homes. Many residents were frustrated and brought on a series of actions that had little merit. Some were most difficult to deal with due to the emotional problems involved.

In each adversary proceeding, Special Counsel was successful after overcoming skillful and persistent opposition and resolving complex, sometimes unique, issues.

Special Counsel was consulted and was involved in many administrative problems due to the unusual problems and difficulties the debtor's operation presented. However, the greatest contribution of Special Counsel was the formulation of the Plan of Corporate Reorganization which was finally approved by the Court.

To begin with, the main body of creditors was not trade creditors or financial institu-

tions that are usually dealt with in this type of case. Rather, the main creditors were the residents who were personally affected by the day-to-day operations of the debtor. The projected amounts of the possible claims of the residents was in excess of $100 million.

Unlike the normal Chapter X case, the financing of the Plan was not to be accomplished by refinancing the debtor's obligations or borrowing new sums of money from traditional sources to be paid out of future profits. The debtor's operation was a nonprofit one. Thus, the Trustee, Special Counsel, and General Counsel had to look to a new and totally different source of funds to finance the Plan.

The Trustee's cooperation in the class actions discussed earlier in this Memorandum involved many hours of consultation with Special Counsel so that funds for the Plan could be a part of the settlement finally approved by the Court in the class actions.

The expertise of Special Counsel was clearly evident in the Plan that was developed to resolve the many unusual problems normally not encountered in a general Chapter X proceeding.

After deducting the sum of $25,157.50, attributed to the preparation of fee applications, the Court approves a total fee of $884,842.50. From this amount must be deducted the sum of $458,408.40, leaving a balance due of $426,434.10. Special Counsel incurred expenses totaling $18,763.85, of which the sum of $15,554.69 has previously been paid, leaving an unpaid balance of $3,209.16, which should be paid.

### STUTMAN, TREISTER & GLATT

*Counsel to Chapter XI Receiver*

■ On November 8, 1977, Richard E. Matthews was appointed Chapter XI Receiver, and on the same date the Stutman firm was appointed counsel to the Receiver.

As noted earlier in this Memorandum, the Receiver and his counsel had a very busy month between November 8, 1977, and December 9, 1977, when this case was converted to a Chapter X proceeding. Mr. Mat-

thews was appointed as Trustee on the same date. Every effort was made to determine the causes of the problems Mr. Matthews would face upon his appointment as Trustee. Counsel prepared a number of orders and pleadings to facilitate the transition from Chapter XI to Chapter X.

Counsel expended a total of 235.75 hours and seeks a fee of $43,350.00. No claim has been made for any expenses. The Court has determined that a reasonable fee for the legal services performed is the sum of $29,528.75.

### STUTMAN, TREISTER & GLATT

*Counsel to Official Chapter XI Creditors' Committee*

■ The Stutman firm had served as counsel for the Unofficial Creditors' Committee prior to filing this Chapter XI proceeding on February 18, 1977. This firm had been involved with the troubles of the debtor since the informal creditors' arrangement through the Credit Managers Association of Southern California in September of 1976. On April 15, 1977, the Stutman firm was appointed counsel for the Official Creditors' Committee in this proceeding and served until November 8, 1977, when they became counsel for the newly appointed Trustee, Richard E. Matthews.

Time records submitted disclose that a total of 239.75 hours was devoted to this assignment, and counsel seeks a fee of $48,350.00 and unpaid expenses of $26.33. No interim fees were paid to counsel during the Chapter XI proceeding.

The Court has determined that a reasonable fee for the services performed is the sum of $32,937.50, which amount is approved. Counsel is also entitled to expenses of $26.33.

### O'MELVENY & MYERS

*Attorneys for the Residents' Committee*

■ During the Chapter XI proceeding O'Melveny & Myers was appointed counsel for the Residents' Special Protective Committee by order of the Court dated October

17, 1977. After this case was converted to a Chapter X proceeding on December 9, 1977, this firm was appointed counsel for the Residents' Committee.

This firm did an excellent job in representing its client, but more importantly, it was able to work with the Trustee and his counsel in resolving many of the problems facing the residents. A great spirit of cooperation developed and this firm met with officials of the Annual Conference, state officials, and others which led to the eventual settlement of many issues. O'Melveny & Myers became involved in the class actions in San Diego, for which services have not been billed against this estate. Additionally, they played a very strong role in the final settlement of those matters with their participation in the preparation of the final settlement agreements. As mentioned above, this debtor estate received the sum of $21 million from this settlement. The role played by this firm in negotiating and obtaining final approval of the Plan of Reorganization was substantial.

Robert J. White, Esquire, of this firm by his conduct, had endeared himself to the residents and, when it came time to resolve many of the residents' claims, his services were invaluable. Many of these claims were filed early in this proceeding and included any and all possible claims for damage. When the Plan of Reorganization was approved for payment of certain claims by the residents, it became necessary to clear the record by objecting and clarifying many of these claims.

Because of his relationship with the residents, Mr. White was asked to undertake this task. He met with many of the residents and fully explored the limitations within which they could recover certain damages. A great number of objections to claims were filed and set for hearing, and it is the Court's recollection that only one resident/claimant attended the hearing to contest the objection to her claim.

In the Chapter XI proceeding, this firm expended 1,366.25 hours of attorneys' time, 134.25 hours of paralegals' time, and 79.50 hours of law clerks' time. No interim fee allowances were made in the Chapter XI proceeding. In the Chapter X proceeding, services performed through August 31, 1981, required 2,076.25 hours of attorneys' time, 203.75 hours of paralegals' time, and 17.75 hours of law clerks' time. Included in this time are 175.00 hours devoted to the preparation of interim and final fee applications. This time had a billing value of $15,055.

This fee applicant seeks a total fee of $349,312 and has received interim fee awards totaling $103,534 for the period ending August 31, 1981. After deducting the value of the time spent in preparing the fee applications, the Court has determined that this applicant be allowed a total fee of $334,257. From this amount must be deducted the sum of $103,534.00 previously received, leaving a net allowance of $230,723. Applicant incurred expenses totaling $22,635 and was paid a total of $8,883.27, leaving an unpaid balance of $13,751.73, which applicant is entitled to receive.

## MEMEL, JACOBS, PIERNO & GERSH

### Special Counsel to the Trustee

By Order entered on December 20, 1977, this law firm was appointed Special Counsel to the Trustee to handle all matters relating to licensing, operating, and receiving compensation by the debtor and residents pursuant to federal and state health and welfare laws and certain private health insurance policies.

They also undertook an analysis of the various issues connected with the tentative terms of settlement agreements between the Trustee, the State of California, and the United Methodist Church as to the effect on the residents relating to future eligibility for Medi-Cal benefits. Special Counsel performed all of these various assignments well, with a minimum of controversy.

This applicant claims a final fee of $149,327 and has received interim payments totaling $85,160. Included in the total claim is the prevailing hourly rate for 1,149.50 hours for a total of $115,079.50. Also included in the total claim is $15,357.50 for

101 hours for the preparation of 19 interim fee applications, the final fee application and appearances in court in support of the fee applications. The applicant also seeks a premium of $18,890 for exceptional services performed.

The last two items totaling $34,247.50 are not allowable in this debtor proceeding. Thus, the adjusted final fee claimed is $115,079.50 against which must be credited the sum of $85,160 previously paid, leaving a balance of $29,919.50, which sum shall be paid.

Throughout this proceeding applicant incurred expenses totaling $4,682.21, of which the sum of $4,128.61 has been paid previously, leaving a balance due of $553.60, which sum shall be paid.

## ARTHUR YOUNG & COMPANY

### Accountants for Trustee

 On February 24, 1978, an order was entered by the Court approving the application of the Trustee to employ the firm of Arthur Young & Company as accountants for the debtor estate. As noted earlier in this Memorandum, a procedure for the payment of interim fees was established for the accountants.

The accountants, under the direction of the Trustee, performed a variety of accounting services, including a series of projections which were of great assistance to the Trustee and his counsel in formulating the Plan of Reorganization. The accountants expended in excess of 10,000 hours, which includes all classifications of accountants and clerks.

The total fee sought by this applicant is the sum of $633,351. They have received interim fees totaling $388,193 on twenty-one fee applications. The difference between the interim payments and the total fee demand is explained as follows: The prevailing hourly rates for the hours expended charged to regular clients total $527,351. This includes the sum of $14,263 representing the entire fees due for the month of August, 1981.

The applicant then claimed $106,000 as a 20.07% premium consisting of the following three items:

| | | |
|---|---|---|
| 1. | 127 hours expended for preparing 21 interim fee applications and the final fee application | $ 5,080.00 |
| 2. | Interest on deferral of full payment of fee on a timely basis | 24,920.00 |
| 3. | Premium for exceptionally high level of expertise on a complex financial matter | 76,000.00 |
| Total | | $106,000.00 |

The Court does not believe that any of the items comprising the $106,000 is compensable in this debtor proceeding.

Thus, Arthur Young & Company is entitled to a total fee of $527,351. Since the sum of $388,193 has been paid previously, the balance due to applicant is the sum of $139,158. Applicant has previously been reimbursed in full for expenses totaling $18,817.

## RICHARDS, WATSON, DREYFUSS & GERSHON

### Counsel for Western and Southern Life Insurance Company

 The law firm of Richards, Watson, Dreyfuss & Gershon (the "Watson firm") represents the Western and Southern Life Insurance Company ("Western and Southern"). At the inception of these proceedings, Western and Southern held mortgages on the Pohai Nani and Wesley Palms facilities. During the Chapter X case, Pohai Nani was sold free and clear of liens, pursuant to Order of this Court entered November 20, 1980. This Order was entered over the strenuous objection of Western and Southern.

In connection with the sale, the Trustee and Western and Southern entered into a settlement agreement dated November 28, 1980, which was approved by Order of this Court on December 2, 1980. That settlement provided that the Trustee or the reorganized debtor would pay to Western and Southern the sum of $50,000 as attorneys' fees incurred by Western and Southern to that date, according to a deferred schedule.

The Watson firm has filed an application for attorneys' fees and reimbursement of expenses incurred from and after December 1, 1980.

Following the execution of the settlement agreement, a dispute developed between Western and Southern and the Trustee as to whether the Trustee had breached the agreement. Western and Southern's primary grievance appeared to be that the Trustee had delayed a few days in making a payment to Western and Southern out of the Pohai Nani proceeds, and that it should have been paid a few thousand dollars in additional interest for that period. The Watson firm's time and requested fees regarding this dispute make up a substantial portion of its requested fee and are excessive in light of the amount of the claim that was involved in the dispute over the alleged late payment.

For almost 20 years Mr. Glenn Watson has been an active practitioner before this Court. In the past, he has been involved in some of the largest cases before this Court and over the years has demonstrated his ability as a trial attorney. During the pendency of this case, the Court has come to know the Trustee, Mr. Matthews, reasonably well and considers both men to be gentlemen. Yet, a dispute developed between them which was regrettable.

Whether these ill feelings developed during the settlement negotiations which the Court approved on December 2, 1980, is unknown. What is known is that the escrow closed on Wednesday, December 3, 1980. The Court recalls that the Trustee delivered to Mr. Watson the sum due on Monday, December 8, 1980. Thus, to recover interest of approximately $2,500 for the alleged late delivery of the money, many disputes arose and litigation was filed which, in the Court's opinion, was costly and unnecessary.

In February of 1981, and while still feuding with Western and Southern over the delayed interest, the Trustee filed an application with the Court for approval of an agreement with Connecticut General Life Insurance Company which provided for a payment to Connecticut General out of the Pohai Nani proceeds and a proposed savings of approximately $1.8 million to the debtor's estate. Western and Southern objected to this application on the grounds that the Trustee allegedly failed to comply with the terms of the Western and Southern settlement agreement. The Trustee disputed Western and Southern's objections and urged their denial since, if they were sustained, Western and Southern's objections might have cost the estate the $1.8 million discount negotiated with Connecticut General.

The dispute relating to the alleged defaults of the Trustee under the settlement agreement and the proposed agreement with Connecticut General were eventually compromised pursuant to a settlement approved by this Court. Pursuant to the terms of the settlement, which was dated March 24, 1981, Western and Southern reserved the right, if any it may have, to apply for reimbursement of attorneys' fees incurred by it after December 3, 1980, but agreed that its request for such fees from December 3, 1980, to March 18, 1981, would not exceed $16,000. It was further agreed that any attorneys' fees awarded for this period of time would be added to the $50,000 award of attorneys' fees provided for in the settlement agreement with Western and Southern and paid at the same time such attorneys' fees are paid. The Watson firm seeks a fee of $14,868.50 and expenses of $1,063.14 for the period from December 3, 1980 to March 18, 1981.

The Watson firm continued to perform legal services for the benefit of Western and Southern after March 18, 1981. Those services were rendered for the benefit of Western and Southern, not for the benefit of the estate. After Western and Southern's counsel received the Trustee's Plan of Reorganization, which was filed with the Court on March 31, 1981, Western and Southern took the position that the Plan did not accurately reflect the terms of the settlement agreement and the stipulation between the Trustee and Western and Southern. Following further negotiations be-

tween the Trustee and Western and Southern, the Plan was modified in a mutually-acceptable fashion.

Payment to the Watson firm was not contingent, because the Watson firm was employed by Western and Southern and reasonably expected to be compensated currently at not less than its normal hourly rates. Likewise, the Watson firm has not suffered any appreciable delay in receiving compensation. The Watson firm seeks a fee of $29,672.50 and expenses of $931.81 for the period subsequent to March 18, 1981.

In light of the foregoing, reasonable compensation for the Watson firm for the period from and after December 1, 1980, to March 18, 1981, is $9,000 and expenses of $500 are awarded and should be paid to Western and Southern along with the $50,-000 amount awarded for services rendered prior to December 2, 1980. This payment should be made on or about December 31, 1985, unless the note is prepaid. An additional fee of $10,000 and expenses of $500 are awarded for the period after March 18, 1981, and should be paid by this estate at the same time as other applicants are paid. The difference in these two awards is based on the differences in the time spent during these two periods and the fact that the time spent prior to March 18, 1981 related to the dispute over the settlement agreement, as to which the Court has already expressed its views.

The allowances set forth above cover all claims by the Watson firm for fees and expenses in this debtor proceeding.

### E. D. YEOMANS

and

### ZISSU, BERMAN, HALPER, BARRON & GUMBINGER

*Counsel for The Mutual Benefit Life Insurance Company*

■ Throughout this Memorandum the Court has made reference to the unfortunate loan made by Mutual Benefit to the debtor in September of 1976; and since that date Mutual Benefit has sought to salvage something from that mistake.

At the time this Chapter XI case was filed, Mutual Benefit held a promissory note in the principal amount of $6 million, which was originally secured by a first deed of trust on the property of Pacific Homes known as Fredericka Manor. That note was also supposed to be secured by a deed of trust on the property of Pacific Homes known as the Santa Monica Boulevard property, but the condition leading to the effectiveness of this trust deed had not taken place when the Chapter XI case was filed.

E. D. Yeomans was employed by Mutual Benefit to represent it in connection with the Chapter XI case and, subsequently, the Chapter X case.

Following the conversion of the Chapter XI case, the Trustee filed a complaint directed against Mutual Benefit and others who claimed liens on the Santa Monica Boulevard property. The Trustee sought to obtain the use, for the benefit of the estate, of the $1.4 million in proceeds of the sale of the Santa Monica Boulevard property. The Trustee eventually prevailed in that litigation; and this Court's ruling was affirmed on an appeal to the United States District Court. Mutual Benefit then took a further appeal to the United States Court of Appeals for the Ninth Circuit. Subsequently, that appeal was dismissed pursuant to a negotiated settlement between the Trustee and Mutual Benefit which was approved by this Court.

Although Mutual Benefit had already employed Mr. Yeomans to represent it in this case, in February of 1981, Mutual Benefit employed the law firm of Zissu, Berman, Halper, Barron & Gumbinger (the "Berman firm") to represent it. No explanation has been given as to why it was necessary for Mutual Benefit to employ a second law firm to represent it when it was already being represented. The result of this employment was unnecessary duplication, as it was necessary for Mr. Yeomans to spend time familiarizing the Berman firm with the case and for the Berman firm to obtain information which Mr. Yeomans

had already developed in the case. According to his time records, Mr. Yeomans first contact with the Berman firm was on April 7, 1981, when he talked to Mr. Fox.

The services for which Mr. Yeomans and the Berman firm seek compensation were for the benefit of Mutual Benefit, not the estate or other parties in interest. Both firms charged Mutual Benefit at their regular hourly rates, and their compensation was neither contingent nor appreciably delayed. Except for the "bonus" sought by the Berman firm, the applications filed by Mutual Benefit's counsel seek the recovery for the benefit of Mutual Benefit of compensation which it has paid or will pay to its counsel.

Under Article VII, Section E, of the Plan, which deals with the payments to be made to Mutual Benefit on account of its note, provision is made only for the payment of principal and interest on that note; no provision is made for payment of attorneys' fees incurred by Mutual Benefit up to the date of the confirmation of the Plan. This differed from the agreement between the Trustee and Western and Southern Life Insurance Company. Article XIV, paragraph G, of the Trustee's First Modified Plan provides that:

"Upon confirmation, Pacific Homes shall be discharged from all indebtedness existing as of February 18, 1977, and from that time which arose during this case, except as expressly preserved and provided for in this plan."

Moreover, Mutual Benefit has not been the prevailing party in any litigation with the Trustee; the Trustee prevailed in the litigation on the Santa Monica Boulevard property proceeds, and the disputes regarding the Plan were settled by compromise.

## E. D. YEOMANS

Mr. Yeomans seeks a fee of $40,356.25 and expenses of $992.80. A total of 495.25 hours were expended, all by Mr. Yeomans, except for two appearances by an associate when Mr. Yeomans was out of town. The real problem for the Court is attempting to find some activity by counsel which benefit-

ed this estate. Mr. Yeomans did the best he could in a situation which should never have happened.

## ZISSU, BERMAN, HALPER, BARRON & GUMBINGER

According to their fee application, this firm became counsel for Mutual Benefit on February 17, 1981. They specialize in real estate, bankruptcy and creditors' rights, litigation and tax. On August 3, 1981, they filed a fee application seeking the sum of $49,773.50 for 474.5 hours of attorneys' and law clerks' time, plus a premium of $25,000. Applicant, on page 13 of its application, justifies the request for the premium

"... to compensate it for the unusualness of the case, the criticalness of the entire period during which the applicant performed the services, the skill with which such services were performed and the benefits of the services to Mutual Benefit and the debtor."

Applicant also seeks reimbursement of expenses totaling $6,725.53.

After almost twenty years on the bench and having passed on thousands of fee applications, it is normal to expect some puffing on the part of fee applicants. On page 10 of the Berman application the following paragraph appears.

"The Applicant respectfully wishes to emphasize that by dint of sheer ingenduity (sic) and hard work, the Applicant was able to turn around the rather difficult circumstances which Mutual Benefit found itself in and achieved a successful recovery on Mutual Benefit's behalf. Moreover, the Estate was immeasurably benefitted thereby inasmuch as the Estate is now able to proceed to confirmation, having satisfied the statutory requisite of the Bankruptcy Act that the Plan be fair and equitable."

Counsel seems to have overlooked the fact that a fine trustee and a highly qualified counsel had made great progress in finalizing this case before applicant became involved.

The first entry on the time record refers to "San Diego Bankruptcy case" and the

Berman firm did not seem to recognize that this was a Los Angeles case. Later, there were many "Mutual Benefit-San Diego" entries.

At the hearing on the fee applications on September 4, 1981, the Court made inquiry regarding the $6,725.53 claimed as expenses. The air fare, meals, and car rentals, all seemed excessive. In answer to the inquiry regarding meals the Court recalls that the cost for dinner for two was approximately $90.

On October 2, 1981, the Berman firm filed an amendment to their fee application, reducing their total fee including premium from $74,773.50 to $69,643.50. They also reduced their expenses, but it is impossible to determine the correct amount except it appears that the original claim for expenses was false or at least put together in a very careless manner.

The reference the Court made to the deficiencies in the fee application does not go to the merits of the issue before the Court, but were mentioned so that these mistakes will not be repeated in the future.

While the Court is of the opinion that the main effort by counsel was primarily for the benefit of Mutual Benefit, the Court recognizes that some of their efforts may have helped in finalizing this matter and that some allowance may be warranted. The Court has spent considerable time in attempting to set a value on these services and has determined that a total allowance of $20,000 can be justified in full satisfaction of all fees and expenses of both counsel, and this sum shall be paid directly to Mutual Benefit since both counsel have been or will be paid by Mutual Benefit.

TITLE INSURANCE AND TRUST COMPANY AND VINCENT L. SHEPHERD

*As Indenture Trustees*

and

LATHAM & WATKINS

*Counsel for the Indenture Trustees*

█ Title Insurance & Trust Company ("TI") and Vincent L. Shepherd ("Shep-

herd") are the indenture trustees under the Indenture of Mortgage and Deed of Trust executed by Pacific Homes as of July 1, 1970, as amended and supplemented (the "Pacific Homes Indenture"), pursuant to which Pacific Homes issued certain Series B first mortgage bonds in the aggregate original principal amount of $5 million (the "Series B Bonds"), and a Series C first mortgage bond in the aggregate original principal amount of $6 million (the "Series C Bond"). Pacific Methodist Investment Fund ("PMIF) is the beneficial owner of the Series B Bonds, and pledged those bonds to TI, as trustee, pursuant to the terms of a Trust Indenture executed by PMIF as of June 1, 1971 (the "PMIF Indenture"), to secure the payment of $5 million in original principal plus interest of collateral trust bonds issued by PMIF pursuant to the PMIF Indenture. TI is the indenture trustee under the PMIF Indenture. The indenture trustees employed the law firm of Latham & Watkins as their attorneys in the Chapter XI and Chapter X cases.

The indenture trustees have sought the following compensation and reimbursement of expenses: Fees in the amount of $32,-989.50 for the period July 1, 1980, through and including June 30, 1981, for "ordinary" services; fees in the amount of $19,957.50 for "extraordinary" services rendered from June 1, 1976, through and including February 29, 1980, in connection with the Pacific Homes and PMIF Indentures; fees of $41,-725 for "extraordinary" services rendered for the period February 29, 1980, through and including June 30, 1981; and reimbursement of legal fees and costs in the amount of $66,361.73 paid to Latham & Watkins for professional legal services.

Latham & Watkins requested final compensation in the amount of $235,000 for professional legal services rendered to the indenture trustees, and $6,543.53 for costs incurred, through the period ending June 30, 1981. Of this amount, $149,118.75 of fees and $3,310.71 of costs were allowed by this Court's Order entered on or about Sep-

tember 26, 1980, and have been previously reimbursed to the indenture trustees; and $66,361.73 ($63,400 for fees and $2,961.73 for costs) has been paid to Latham & Watkins by the indenture trustees, who sought reimbursement therefor, as previously indicated. Accordingly, Latham & Watkins sought a further allowance of compensation in the amount of $22,481.25 and $271.09 in costs.

Subsequently, Latham & Watkins withdrew its request for such compensation. Instead, it has invoiced the indenture trustees for the additional amount, and this amount has been added to the reimbursement of expenses sought by the indenture trustees.

The hourly rates requested by the indenture trustees for the "extraordinary" services are unreasonably high, given the nature of the services and the personnel who rendered them. The personnel who rendered those services were salaried personnel of TI who were not acting as its attorneys or paralegal personnel, and were not providing legal services. Latham & Watkins provided those legal services and TI will be reimbursed for the correct allowable amount of such services. Nevertheless, an hourly rate similar to that of an attorney is sought for Mr. Shepherd's work, and an hourly rate in excess of that of a paralegal is sought for Mrs. Jackson's work.

The indenture trustees seek additional compensation for the following items:

| | |
|---|---|
| Ordinary fees | $ 32,989.50 |
| Extraordinary fees | 61,682.50 |
| Attorneys' fees paid by indenture trustee | 66,361.73* |
| Total | $161,033.73 |

* includes expenses of $2,961.73

The Court believes that a reasonable fee for the extraordinary fees is the sum of $40,000. Thus, the total of the items listed above is $139,351.23.

Counsel for TI seeks a total fee of $235,000 and expenses of $6,543.53. From this estate counsel has been paid fees totaling $149,118.75 and expenses of $3,310.71 and seeks a balance due of $22,481.25 in fees and expenses of $271.09.

Since counsel has withdrawn its fee request and assigned this recovery to TI, the total due to TI in fees is $158,780.75 and expenses of $3,232.82.

The amounts awarded to the indenture trustees as compensation and reimbursement of expenses, including attorneys' fees, should be paid from the funds paid or to be paid by the trustee to the indenture trustees pursuant to their stipulation of February 23, 1981, and the First Modified Plan.

## COOPERS & LYBRAND

### *Accountants for Debtor In Possession*

■ By order of the Court dated May 27, 1977, this applicant was employed as an accountant for the debtor in possession. The primary purpose for employing this firm was to conduct a series of studies of the debtor's financial condition and to prepare a series of projections for the years 1977 to 1986. It was estimated that the professional fee would be $45,000 and expenses $10,000. A total of 647.5 hours of professional time was expended at a normal bill in 1977 of $43,136.31. On this assignment applicant also incurred expenses totaling $5,184.76.

Prior to assuming the above duties the applicant performed regular accounting services having a value of $3,500. Subsequent to the above assignment, additional accounting services having a value of $674.00 were performed and expenses in the sum of $160.68 were incurred. All services set forth above were completed in 1977 while this was a Chapter XI proceeding. Applicant billed the debtor in possession in 1977 for these services, but was never paid. The total of all fees amount to $47,310.31 and expenses to $5,345.44. The Court believes that these fees and expenses are proper and should be paid.

## JOHNSEN, MANFREDI & THORPE

### *Special Counsel for the Residents' Committee*

■ On April 2, 1979, applicant was appointed as Special Counsel to the Residents'

Committee in connection with the Committee's assertion that the lien of Pacific Methodist Investment Fund ("PMIF") should be equitably subordinated with respect to the proceeds of sale of Desert Crest and Kingsley surplus properties.

Counsel researched the problem and filed appropriate pleadings. PMIF filed an answer and a pre-trial hearing was held. At that point in the litigation, grounds for a possible settlement of this problem was brought forth which eventually led to a settlement, which settlement was approved by the Court.

Throughout the time services were performed by the Johnsen firm, they did not receive interim fees or reimbursement of expenses. During this assignment, 123 hours of attorneys' time and 1.5 hours of law clerks' time were expended. No time has been claimed for the preparation of fee applications and appearances in court in support thereof. They claim a total fee of $12,817.50 and unreimbursed expenses of $274.01.

The Court has reviewed all documentation in support of this fee application and finds that the fee request of $12,817.50 is reasonable and that the expenses of $274.01 are properly recorded. Accordingly, the Court allows both sums.

## CREDIT MANAGERS ASSOCIATION OF SOUTHERN CALIFORNIA

*Secretary to Official Creditors Committee*

■ On February 3, 1978, this applicant was appointed Secretary to the Official Creditors Committee. They served in this capacity until after the approval of the Plan of Reorganization.

During their tenure, they attended all meetings of the Creditors' Committee and prepared and mailed ten bulletins to 1,199 creditors. They prepared and sent 36 notices to the 18 members of the Committee. The Secretary expended 39.05 hours of time and seeks a fee of $2,222.50 and reimbursement of expenses totaling $2,748.73. This applicant received no interim payments for either fees or expenses.

The Court has reviewed all the supporting documents submitted with this application and has concluded that the requests for fees and expenses are reasonable and allowable. The applicant is allowed a fee of $2,222.50 and expenses of $2,748.73, or a total of $4,971.23.

## EARLE HAGEN

*Counsel for Creditors' Committee*

■ Mr. Hagen was appointed counsel for the Creditors' Committee on January 17, 1978. On May 29, 1981, he filed his first fee application for the period between January 17, 1978, and January 25, 1980. He sought a fee of $31,812 for 289.20 hours of legal services, all of which were performed by himself. The Court approved the fee application, but only at the interim hourly rate. Thus, the amount was reduced to $26,028.

A second fee application was filed by Mr. Hagen for the period from January 30, 1980, to June 23, 1981, and an amendment which included the period from June 23, 1981, to July 31, 1981. During this period Mr. Hagen expended a total of 137.25 hours at the interim hourly rate totaling $14,664.18. Mr. Hagen also incurred expenses totaling $255.95.

It was during this period that the Securities & Exchange Commission filed objections to the payment of any interim fees to Mr. Hagen until the case was finalized. On August 12, 1981, Mr. Hagen filed a statement with the Court waiving any additional fees over and above the interim fees allowed by the Court. The Court allowed fees to Mr. Hagen at the reduced interim rates. Had he been paid a final fee at the end of the case at the full prevailing hourly rates, it would have resulted in additional costs to this estate in excess of $7,500 over and above what was paid on the interim allowances.

By Order dated September 9, 1981, the Court allowed Mr. Hagen a total fee for services rendered from January 30, 1980, to July 31, 1981, of $14,546.20 and expenses of $188.80, or a total sum of $40,763. No final fee application is pending before this Court.

CLERK OF THE BANKRUPTCY COURT

■ When the notice of the hearing on the fee applications was sent to all creditors and interested parties, the sum of $100,000 was listed as the possible cost to be paid to the Clerk of the Court. At that time the Court did not know the total charges and, since this Court had not been appointed Special Master as discussed at the outset of the Memorandum, the Court was uncertain as to the extent of the fee that could be charged for the services of the Court in presiding over the many litigative matters and the exceptional large amount of time devoted to administrative matters because of the unique nature of this case.

The Clerk of the Court has provided the Court with the special charges which total $4,811.85. This amount might appear large, but there is an explanation. On two of the mailings to the creditors by the Trustee, of approximately 2,500 each, one relating to the mailing of a notice, and one relating to the mailing of the Plan of Reorganization, the Clerk's Office furnished the Trustee with 5,000 franked government envelopes, including 2,500 9 × 12 envelopes. The Court believes this total charge is reasonable and proper.

As to the fee allowable for the services of this Court, research on this problem was necessary.

Section 241 of the Bankruptcy Act (11 U.S.C., Section 641) provides as follows:
"The judge may allow reimbursement for proper costs and expenses incurred by the petitioning creditors and reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred in a proceeding under this chapter—

(1) by a referee;

(2) by a special master;

(3) by the trustee and other officers, and the attorneys for any of them;

(4) by the attorney for the debtor; and

(5) by the attorney for the petitioning creditors.

Such compensation of referees and trustees shall not be governed by sections 40 and 48 of this Act."

Rule 10–103(a)(2) of the Rules of Bankruptcy Procedure provides as follows:
"(2) If a local rule does not provide for automatic reference of a Chapter X case by the clerk, the case shall be assigned to a district judge, who may act himself or may, at any time during its pendency, refer the case to a referee or to more than one referee concurrently as bankruptcy judge or judges generally or for any specified purpose."

As noted at the outset of this Memorandum (page 8), the District Court Judge by an order entered on December 9, 1977, directed this Court to hear and determine all matters. Thus, this Court has handled all matters relating to this proceeding.

At the Fifth Seminar for Referees in Bankruptcy held in Washington, D. C. from March 25 to 29, 1968, Judge Howard V. Calverley, formerly of this Court, gave a paper on this problem which appears in the *Proceedings of Fifth Seminar for Referees in Bankruptcy*, pages 477–484. There is set forth below a short passage from Judge Calverley's paper.

"Section 241 of the Act provides that the judge may allow reimbursement for proper costs and expenses incurred by the petitioning creditors and reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred in a proceeding under this chapter by a referee; special master; the trustee and other officers, and attorneys for them; the attorney for the debtor; and attorney for the petitioning creditors. The compensation of referees and trustees shall not be governed by Sections 40 and 48 of the Act. This means that for your services as referee or special master in these cases, you must claim 'reasonable compensation' for services rendered. If you don't, you may be in difficulty with the Administrative Office. This is not a 'bonus' for you, but is paid to the Administrative Office for the Salary and Expense Fund."

Thus, the Court has determined that a fee should be charged to this estate for the services of the Bankruptcy Referee/Judge.

All bankruptcy cases today seem to be flooded with pleadings of all descriptions. This case, involving 1,800 elderly residents, was no exception. Over 100 complaints were filed by residents to determine the dischargeability of their claims arising out of the breach of their life-care contracts. Fortunately, most of these complaints never came to hearing since those problems were dealt with in the Plan.

Throughout this proceeding, both under Chapter XI and Chapter X, the Court held 75 hearings, three of which were held on April 12, 13, and 14, 1982, respectively. While many of these hearings were accomplished in half-a-day or less, there were a number of hearings, such as the ones relating to the sale of Desert Crest and Pohai Nani properties, hearings seeking to have the proceeds of sales released, and finally the hearings on the Plan which covered several days.

Reviewing the hundreds of pieces of pleadings in preparation for hearings was time-consuming. Also taking much time was reviewing and approving the hundreds of orders entered in this proceeding. Many conferences by telephone and in person were held with persons involved in this proceeding due to the many unusual problems presented in this case.

The preparation of this Memorandum took a considerable period of time. While the task of checking all fee applications against the final fee applications was not easy, the Court must admit that there was some duplication of effort due to the fact that between the hearing on the fee applications on September 4, 1981, and the filing of this Memorandum, the presiding judge was hospitalized three times, the last confinement occurring in the month of March, 1982. This required the Court to review work previously performed on this Memorandum. The Court regrets the delay in finalizing this matter.

Considering all factors involved, the Court has determined that the reasonable value of all services performed by the Court is the sum of $70,000. To this must be added the sum of $4,811.85 for special charges, or a total of $74,811.85, payable to the Clerk of the Bankruptcy Court.

Pursuant to the provisions of Rule 52 of the Federal Rules of Civil Procedure and Rule 752 of the Rules of Bankruptcy Procedure, the findings of fact and conclusions of law set forth hereinabove are sufficient, so that separate Findings of Fact and Conclusions of Law are not necessary.

Each fee applicant awarded fees and expenses herein shall prepare and lodge with the Court an appropriate order covering the allowances approved by the Court.

