**In re CITIZENS MORTGAGE INVEST-MENT TRUST ("CMIT").**

**Bankruptcy No. 78–1878–JG.**

United States Bankruptcy Court,
D. Massachusetts.

Feb. 24, 1984.

## MEMORANDUM

JAMES N. GABRIEL, Bankruptcy Judge.

STATEMENT OF FACTS:

Before the Court are the final applications for compensation and for reimbursement of expenses in the Chapter X proceeding of Citizens Mortgage Investment Trust ("CMIT"). Before examining the merits of each fee application, a review of the history of this Chapter X case is appropriate.

CMIT filed its Chapter X Petition under the Bankruptcy Act of 1898 on October 5, 1978. CMIT was organized as a Massachusetts business trust in June of 1969. Its purpose was to permit small investors to participate in large real estate investments and to finance large real estate developments. CMIT was authorized to issue an unlimited amount of shares of beneficial interest, which would participate equally in distributions. These were traded on the New York Stock Exchange.

CMIT decided to expand its lending program in 1973 to over one-hundred million dollars ($100,000,000) and to include investments throughout the United States. In 1973 CMIT issued twenty million dollars ($20,000,000) in Senior Subordinated Notes at eight and one-half per cent (8½%) due in 1980. The notes were registered on the New York Stock Exchange.

As a result of the 1973–1974 real estate market slowdown, increase in interest rates, and decline in the securities market, CMIT's loan revenues decreased and receipts from commercial paper sales reduced. A number of CMIT's borrowers defaulted and it was required to takeover and develop numerous properties.

In late 1974, CMIT entered into a revolving credit agreement with thirteen banks, on which it ultimately defaulted. As of the end of 1975 CMIT reported a negative equity of eleven million three hundred thousand

dollars ($11,300,000). In early 1976 the New York Stock Exchange suspended trading its shares, and The American Stock Exchange ceased trading CMIT warrants and notes. Unable to make payments on the Senior Subordinated Notes, and unsuccessful in restructuring its debt in 1977 and 1978, CMIT filed its Chapter X Petition on October 5, 1978. The United States District Court, District of Massachusetts, appointed Attorney William A. Brown as Reorganization Trustee, and authorized him to employ the law firm of Barron & Stadfeld and Attorney Hertz Henkoff as counsel to the trustee. Early in the case, the Trustee also retained numerous Special Counsel throughout the United States to represent him in real estate sales, foreclosures, and litigation in which CMIT was involved. A real estate business expert was employed to aid in operating CMIT. A large accounting firm was hired to audit CMIT's books and records.

As of the date of the filing CMIT had assets of approximately sixty million dollars ($60,000,000). It owed the eight senior banks sixty million dollars ($60,000,000) in principal and interest pursuant to the 1975 loan agreement. Its ordinary business debts were approximately ninety-seven thousand dollars ($97,000). Pursuant to a 1973 Trust Indenture, the twenty million dollars ($20,000,000) in Senior Subordinated Notes remained outstanding. Disputed claims totalled approximately seven million five hundred thousand dollars ($7,500,000). As of the filing date, there were one million four hundred twenty one thousand three hundred (1,421,300) shares of beneficial interest outstanding.

Upon assuming office, the Trustee moved CMIT's headquarters from Michigan to Boston, and reduced the staff to seven employees. He recovered a $350,000 deposit from the debtor's former law firm. As a company with publicly-held and traded debt and securities, the Trustee was obligated to file numerous financial reports with the Securities and Exchange Commission. The Trustee, early in the case, designated a number of properties for sale, and by February 1981 ten properties had been sold. The case was referred to me on October 18, 1979.[1]

Under Section 167 of The Bankruptcy Act,[2] the Trustee was required to investigate the acts, conduct, liabilities, and operation of the debtor, and desirability of continuing the business. In the investigation, numerous officers, directors, and employees of CMIT were deposed and much litigation resulted from oppositions to discovery. After a one year investigation, in October 1980 the Trustee commenced several actions in Massachusetts and Michigan state courts against CMIT's trustees, directors, officers, attorneys, and accountants, as a result of their failure to perform contractual and legal obligations. This action was vigorously contested by the defendants, and accounts for much of the time expended by counsel and special counsel to the trustee.

In his Section 167 report (dated February 12, 1981) the trustee proposed an orderly and supervised liquidation of CMIT, and the trustee's liquidating plan was filed in May of 1981. The plan was confirmed on March 25, 1982. After the filing of this plan, a controversy arose between the Senior Bank creditors and the noteholders. The noteholders brought an action seeking to subordinate the banks' claims on equitable grounds. This Court dismissed the noteholders complaint, but permitted them to object to the banks' claims. Discovery and litigation continued until September of 1982 when the parties proposed to compromise the dispute. The banks agreed to release all claims against the estate in exchange for payment of fifty-six million dollars ($56,000,000), which approximated the amount of principal owed, waiving all interest and attorneys' fees. The Court approved the

---

1. This Chapter X case was referred to me as bankruptcy judge pursuant to Section 117 of the former Act. Therefore, the Bankruptcy Court is the appropriate forum to determine the amount of reasonable compensation allowable to the various applicants. *See J. Moore,* *6A Collier On Bankruptcy,* Par. 13.03, at 555 (14th ed. Supp.1982).

2. The Bankruptcy Act of 1898, 11 U.S.C. Section 567 (repealed 1978).

compromise and as a result of this settlement, trade creditors of CMIT were paid in full, leaving the noteholders as the sole remaining class of claims.

In 1982, the trustee received an offer to purchase CMIT's mortgage portfolio for ten million one hundred fifty thousand dollars ($10,150,000). After a hearing was held at which sealed bids were accepted, the sales price obtained was twelve million eight hundred five thousand dollars ($12,805,000).

In late 1982, various noteholders expressed interest in reorganizing CMIT, as its assets approximated twenty million dollars and its liabilities totalled about twenty-five million dollars ($25,000,000). A modification filed by Stanford N. Phelps proposing to pay noteholders the equivalent of fifty per cent (50%) of their claims was approved by the Court for balloting in early 1983. Objections to confirmation were filed. A hearing on acceptances and confirmation was held, at which time a report was made that acceptances were not obtained and a recount was necessary. The Court heard the objections to confirmation and evidence in support of confirmation, and took the matter under advisement, pending the report of acceptances.

Several noteholders (Licht and Maguire) vigorously fought against acceptance. Maguire objected to the authenticity of numerous ballots, necessitating a review of each. This dispute was ultimately resolved by the parties. Maguire obtained an appointment to the CMIT Board, and Licht obtained payment for his expenses and his notes were purchased by Phelps. The plan as modified was confirmed on September 8, 1983 and assets totalling approximately $25,000,000 in assets were transferred to the reorganized company.

In the fall of 1983, the Trustee proposed to compromise the litigation against the officers, having negotiated an offer of $2,000,000. The offer was noticed, and after hearing on the reorganized CMIT's objection, the Court authorized the compromise. The settlement also disposed of alleged administrative claims by the directors and officers against the estate for reimbursement of their costs and expenses in defending the Trustee's litigation.

On November 29, 1983, the Court heard the applications of counsel and other functionaries for final fees and objections of CMIT and took the applications under advisement.

FEES IN CHAPTER X PROCEEDINGS:

In a Chapter X proceeding, the Court has authority to allow reasonable compensation for necessary services and expenses to the referee, special master, trustee, his attorneys, debtor's attorney, and persons assisting functionaries. The Bankruptcy Act of 1898, Section 242, 11 U.S.C. Section 642 (repealed 1978). Court-appointed officers are entitled to reasonable compensation whether or not their services produce any benefit to the estate. *See In Re Food Town, Inc.,* 208 F.Supp. 139, 145 (D.Md.1962). Securities holders, creditors, stockholders, indenture trustees, and their representatives may also be allowed compensation for services, if such services benefitted the estate. The Bankruptcy Act, Sections 242, 243, 11 U.S.C. Sections 642, 643 (repealed 1978); Bankruptcy Rule (10–215)(c)(1)(B) (repealed 1978); *J. Moore, 6A Collier on Bankruptcy,* Par. 13.01, at 523 (14th ed. Supp.1982). Participation in a Chapter X proceeding does not automatically entitle a party to compensation. Services performed in self-interest, such as those rendered to maximize one's claim, are not compensable where no resulting benefit to the estate can be found. *See In Re Interstate Stores, Inc.* 1 B.R. 755 (Bkrtcy.S.D.N.Y.1980). An applicant has the burden of demonstrating entitlement to compensation. *J. Moore, 6A Collier on Bankruptcy,* Par. 13.01 at 531–32, (14th ed. Supp.1982).

Many Chapter X decisions concerning fee awards emphasize economy of administration as the factor governing allowances in reorganization cases. *E.g., In Re First Colonial Corp. of America,* 544 F.2d 1291, 1299, 1300 (5th Cir.1977); *Massachusetts Mutual Life Insurance Co. v. T.H. Brock,* 405 F.2d 429 (5th Cir.1968). Other courts have rejected this factor, holding that allowances should be reasonable and liberal enough to

encourage competent persons to render services in such complicated reorganization cases. *See, e.g., Matter of R. Hoe & Co.,* 471 F.Supp. 493 (S.D.N.Y.1978). In my view, the strict economy factor is inappropriate, especially in view of Congress' criticism of the principle in enacting the 1978 Bankruptcy Code, and therefore, I shall be guided by the Chapter X mandate—"reasonable" compensation.

■ While "reasonable compensation" is not capable of reducing to a mathematical formula, courts have turned to a variety of factors in arriving at reasonable fee awards: (1) the time and labor required; (2) the novelty and difficulty of the question presented; (3) the skill required to perform the legal services; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; (12) awards in similar case. *King v. Greenblatt,* 560 F.2d 1024 (1st Cir. 1977); *Furtado v. Bishop,* 635 F.2d 915 (1st Cir.1980); *In Re Westec Corp.,* 313 F.Supp. 1296 (S.D.Tex.1970).

■ The method employed in this circuit of applying these factors is referred to as the "lodestar" approach, which is a two-step procedure. The Court must calculate the number of hours reasonably spent, and multiply this by a reasonable hourly rate. The number of hours actually spent is not necessarily the equivalent of hours reasonably expended. *In Re Casco Bay Lines, Inc.,* 25 B.R. 747 (Bkrtcy.App.Me. 1st Cir. 1982). The Court must eliminate time spent "beyond that consistent with a standard of reasonable efficiency and productivity . . ." *King v. Greenblatt,* 560 F.2d 1024, 1027 (1st Cir.1977). Furthermore, unrecorded or inadequately documented time is disallowed. *Cle-Ware Industries, Inc. v. Sokalsky,* 493 F.2d 863, 877 (6th Cir.1974).

Compensation for time spent preparing fee applications is not compensable. *See Matter of Liberal Market, Inc.,* 24 B.R. 653, 661 (Bkrtcy.S.D.Ohio 1982); *In Re Pacific Homes,* 20 B.R. 729 (Bkrtcy.D.Cal.1982); *In Re Absco, Inc.,* 23 B.R. 250 (Bkrtcy.E.D. Penn.1982). To determine the reasonable number of hours spent, the Court looks to these factors: necessary time, and labor required, the novelty and difficulty of issues presented, and the opposition encountered. *In Re Casco Bay Lines, Inc.,* supra, at 755.

■ Next, the Court must determine the reasonable hourly rate for each applicant. Included in this determination are consideration of: the level of skill necessary to perform the services, the customary fee in the community, the reputation of the applicant, time limitations imposed by the client, the size of and amount involved in, the case, desirability of the case, the results of the services, and preclusion of other employment. *In Re Casco Bay Lines, Inc.,* supra, at 755. Multiplying the reasonable hourly rate by the reasonable number of hours produces the "lodestar". This figure may then be adjusted either upward or downward to take into consideration the other applicable factors: the quality of representation, and delay in payment, and the contingent or fixed nature of the fee. *In Re Casco Bay Lines, Inc.,* Supra, at 756. A premium upward adjustment or "bonus" is appropriate only where services have produced a particularly exceptional benefit to the estate. *In Re Garland Corp.,* 8 B.R. 826 (Bkrtcy.D.Mass.1981). Since competency is expected, a high level of expertise in a complicated reorganization case does not automatically warrant a bonus. *See Southwestern Media Inc., v. Rau,* 708 F.2d 419, 428 (9th Cir.1983); *Matter of Aldersgate Foundation, Inc.,* 10 B.R. 910, 915 (Bkrtcy. M.D.Fla.1981). Thus, a fair and reasonable award "presupposes a high level of special skill." *In Re Continental Mortgage Investors,* Slip opinion No. 76–593–S (D.Mass. December 1, 1983).

■ The general principle governing reimbursement of expenses is that the

charges must have been necessary. Charges which are part of the routine cost of operating overhead are not properly chargeable to the estate. *In Re Anson, Inc.,* 34 B.R. 590 (Bkrtcy.D.R.I.1983). Thus, reimbursable expenses do not include the ordinary costs of operating an office, such as: overtime to employees, rent, express charges, ordinary postage, and routine copying. *See Matter of Interstate Stores, Inc.,* 437 F.Supp. 14 (S.D.N.Y.1977); *J. Moore, 6A Collier on Bankruptcy,* Par. 13.-02, at 549 (14th ed. Supp.1982).

## WILLIAM A. BROWN, ESQUIRE

William A. Brown, a Boston attorney, was appointed Chapter X Trustee on October 5, 1978. He seeks total compensation for services as trustee of $552,374.09 and $7798.72 for expenses. He has received interim fee awards of $226,616.19, and has been reimbursed $6477 for expenses. The trustee currently seeks $325,757 as the balance of his fee and $1321.48 for remaining expenses.

With respect to time spent, Mr. Brown's total hours come to 3192.85. In examining the itemizations attached to his application, I find that the hours actually expended were reasonable and necessary to the performance of the myriad of duties and obligations of a Chapter X Trustee. His actual hours shall be allowed to serve as his time base.

Applying the various factors to determine a reasonable hourly rate, it is difficult, however, to allow the requested hourly rate and the premium charge. From August 1979 to March 1982, Mr. Brown charges $125 per hour and during the period from 1982 to 1983 the Trustee charges $175 per hour, which are his rates charged as an attorney during the respective years. This results in an average hourly rate over the course of the case of $140, which has not been justified. The Trustee is not entitled to compensation according to his billing rate as an attorney, but rather is entitled to reasonable compensation for operating the business as a chief executive officer, not as a lawyer. *See In Re SMS, Inc.,* 15 B.R. 496,

8 B.C.D. 718, 721 (Bkrtcy.D.Kan.1981). Moreover, Mr. Brown did not operate the debtor's business on a day-to-day full-time basis. The CMIT staff and appointed functionaries aided him in managing the business. He did not devote the majority of his time to CMIT business. This is not meant to criticize the trustee's service. The amount of time spent and the work required was vast. At the outset of the case, the Trustee was responsible for reacting to numerous crises of emergency nature and he was successful in stabilizing business operations. The Trustee ably investigated the debtor and its causes of action, proposed a plan, liquidated assets, and participated as a party in the many creditor disputes. Throughout the case he was forced to make difficult decisions concerning the numerous properties in the face of much opposition. However, Mr. Brown was always assured of payment in view of the value of CMIT's unencumbered assets, and he received 70% of his total request in interim awards. It is a reasonable conclusion that Mr. Brown spent approximately one third of his time working on CMIT matters, thus he was not precluded from other employment, and did, in fact, practice law while CMIT trustee. It is my conclusion that Mr. Brown is entitled to $90 per hour for 1978, $95 per hour for 1979, $100 per hour for 1981, $110 for 1982, and $110 for 1983. This results in a mixed hourly rate of $102 per hour for his years of service.

This hourly rate justly compensates the Trustee without the need for a bonus. Although the Trustee must be commended for his orderly liquidation of the assets, he did not reorganize the company. Accordingly, compensation for services rendered shall be allowed in the amount of $324,700. The balance due to the Trustee is $98,083.81. The Trustee's expenses sought of $7798.72 shall be allowed in full. The balance of expenses to be reimbursed is $1132.14.

## BARRON & STADFELD

Barron & Stadfeld has served as Counsel to the Trustee throughout the case. They seek a total allowance of $2,504,865.71 for fifteen thousand one hundred and twen-

ty-six (15,126) hours of work. Barron & Stadfeld has received interim awards to date of $1,118,154.34. Expenses are sought in the amount of $131,187.71 of which $126,-945.90 has been reimbursed to date.

For convenience, the application of Barron & Stadfeld shall be divided into two categories, according to services rendered in general matters and in the Trustee's litigation.

For general legal services to the Trustee, Barron & Stadfeld seeks $1,511,526.87. As Counsel to the Chapter X Trustee, they were called upon to give advice and represent the Trustee continuously and regularly. Services were performed by ten different attorneys and two paralegals, and the hourly rate requested ranges from $40 to $175. Hours reported spent on general matters are approximately twelve thousand. In scrutinizing the time records, I have concluded that the firm spent excessive time in inter-office attorney conferences. Also, there are many instances where several attorneys attended hearings and conferences. Therefore, I have reduced the allowable time basis by seven hundred hours to seven thousand three hundred hours. See Bradford v. Blum, 507 F.Supp. 526 (E.D.N.Y.1981); In Re Idak Corp., 26 B.R. 793 (Bkrtcy.D.Mass.1982).

The mixed hourly rate over the duration of the case sought by Barron & Stadfeld is approximately $126. Ten attorneys were assigned to the case. Most of the work was performed by Hertz Henkoff whose average hourly rate is $140 and Melvin Hoffman, whose average hourly rate is $91. Barron & Stadfeld's advice was required on every transaction concerning the estate's forty-six properties, to recover preference payments, in compiling the section 167 report, in preparing SEC filings, in drafting and obtaining confirmation of the Trustee's plan, and in dealing with the bank's asserted claims, and counterclaims of the noteholders. Opposition encountered and the number of parties involved made complicated legal questions more difficult. Especially at the commencement of the case counsel acted under strict time constraints. Much

work, on the other hand, was basically routine, consisting of telephone status conferences, analysis of documents, and scheduling and updates. It also appears that partners sometimes performed legal research services which should have been delegated to associates at a lesser rate. The hourly rates charged for services rendered in 1979, 1980 and 1981 are more than the customary charge in the community for similar work. See Pilkington v. Bevilacqua, 632 F.2d 922 (1st Cir.1980); Lamphere v. Brown University, 610 F.2d 46 (1st Cir.1979); Lund v. Affleck, 587 F.2d 75 (1st Cir.1978); Souza v. Southworth, 564 F.2d 609 (1st Cir.1977). Therefore, it is my determination that the average reasonable hourly rate over the course of the proceedings is $110.

Neither an upward nor a downward adjustment of this rate is warranted. There has been no delay in payment because interim allowances of $1,118,154 have been paid. The Trustee's Counsel's work was competent and of good quality, but their request for a $500,000 bonus seems arbitrary. Therefore, the total award for general work shall be $1,243,000.

For the Trustee's litigation Barron & Stadfeld seeks compensation of $451,945.50 for legal services and $41,393 for expenses. Most of the litigation work was performed by Kevin Moloney whose hourly rate ranges from $90 to $140 over the course of the case.

In determining the appropriate award to Barron & Stadfeld for litigation work, it is important to note that the Trustee had special counsel representing him in these cases as well, and this firm is seeking compensation of approximately $380,000. While undoubtedly a measure of cooperation and coordination was necessary between Boston and Michigan counsel, an examination of the time records shows an inordinate amount of duplication by the two firms. In several instances, Attorney Moloney appeared and participated in matters before the Michigan courts and in preparing and taking depositions in Michigan. He also spent time in unnecessary telephone conferences with Attorney Fanger, which

must be considered the same as inter-attorney meetings, warranting a reduction in time. Therefore, after a review of the time entries, I will allow 2950 hours for the Trustee's litigation. This considers that Mr. Moloney did spend nearly all of his working hours on this case.

Arriving at a reasonable hourly rate necessitates cognizance of the complicated nature of the lawsuits. Counsel was required to reconstruct numerous loan transactions and analyze thousands of documents before instituting the actions. The lawsuits were commenced in May of 1981. The number of parties with various defenses made the litigation more complex. Discovery was vigorously contested by both Michigan and Massachusetts defendants. After serious negotiations spanning four months, the Trustee accepted an offer to compromise the Trustee's litigation for two million dollars, which this Court approved after notice, objection, and hearing. Mr. Henkoff was largely responsible for negotiating the settlement on behalf of the Trustee; his participation was necessary and instrumental. Accordingly, I find a reasonable hourly rate for the Trustee's litigation to be $120 per hour. An upward adjustment for results achieved is not justifiable. The two million dollar settlement was a fair, not a superb result. While addendum clauses are often inflated, the amount of damages sought was twenty million dollars. Moreover, it appeared to this Court that the litigation obtained a life of its own. Thus, $354,000 shall be paid to Barron & Stadfeld for the Trustee's litigation. The total award to the firm is $1,597,000. To date interim awards of $1,118,154.34 have been paid, leaving a balance payable of $478,845.66.

Barron & Stadfeld seeks reimbursement for expenses of $131,187.71 of which $126,945.90 has been paid. They seek an additional $4241.81, $716.77 of which represents expenses for general matters, and of which $3198.39 represents amounts withheld from previous interim awards. In reviewing the itemization of expenses, it appears that the firm's charges for the expense items word processing, routine photocopying, Federal Express, Lexis, and cab fare are excessive.

Thus, expenses shall be reimbursed in the total amount of $127,413.97, $468.07 remaining to be paid.

## BUTZEL, KEIDAN, SIMON, MYER & GRAHAM

■ This Michigan law firm was Special Counsel to the Trustee, appointed on February 27, 1980. They rendered services in three areas, investigation of the debtor's financial affairs, recovery of a preference, and representation of the Trustee in the litigation. Butzel, Keidan seeks a total allowance of $381,245 compensation and $60,569 for expenses. They have received interim awards of $234,481.50 for services and $53,806 for expenses. The firm's time actually expended totals 3173.6 hours. Most of this was in connection with the Trustee's litigation. As mentioned previously, a more efficient division of labor between this firm and Barron & Stadfeld could have been accomplished. In addition, the time records show numerous hours spent for "research", the purpose of which is undocumented. This inadequately detailed time requires a reduction. *See In Re R. Hoe & Co., Inc.,* 471 F.Supp. 493 (S.D.N.Y.1978). I find that the applicant's amount of time reasonably expended is two thousand nine hundred (2900) hours.

Butzel-Keidan's requested average hourly rate is approximately $105 per hour. They also seek a $50,000 bonus. I find a reasonable average hourly rate over the course of the case to be $97 per hour. From this firm's standpoint, the case presented difficult conflicts of law issues and necessitated restructuring of the debtor's complex financial affairs. I have found the hourly rates charged by associates to be very reasonable and have merely reduced two of the partner's hourly rates. I cannot agree that a bonus is appropriate in view of the result or for any other reason. The result, the two million dollar settlement, was not exceptional. Payment was neither contingent nor delayed. Butzel, Keidan received $235,000 in interim awards. The application shall be allowed in the amount of $281,300.

Butzel, Keidan requests reimbursement of $6742.47 for the period of April 1983 to October 1983. This shall be allowed to the extent of $5096.19, because I have eliminated certain charges for Lexis and overnight express. An additional $5,000 shall be allowed for expenses withheld from previous interim requests. The total amount of reimbursable expenses is, therefore, $10,096.19.

### RUSSELL N. COX

■ In September 1980 Russell Cox was appointed to act as the Trustee's real estate expert in analyzing, operating, and managing the numerous CMIT properties, at compensation not to exceed $100 per day. The previous awards totalling $177,992.10 are hereby confirmed. His present request seeks an additional amount of $6900 for sixty-nine hours of work. The requested amount shall be allowed. Mr. Cox's real estate expertise was of much assistance to the Trustee in accomplishing an orderly liquidation of the CMIT holdings. If the bankruptcy courts are to have access to such experts, they must be paid in accordance with their usual billing practices. *In Re Idak Corp.*, 26 B.R. 793, 798 (Bkrtcy.D. Mass.1982). Reimbursement of expenses in the amount of $1036.53 is allowed.

### SMITH, MIRO, HIRSCH & BRODY

■ This firm was employed as special counsel to the Trustee during 1979 in connection with certain sales of the debtor's properties. It is also noteworthy that this law firm which served as pre-bankruptcy counsel to CMIT was also a defendant in the Trustee's litigation.

Smith, Miro seeks ratification of the prior interim allowance of $12,891.50 for services from 1978 to June 1979, and seeks additional compensation of $5145 for the period of August to November 1979 plus $159.36 in expenses. The interim awards are confirmed. Further compensation is denied. The application dated January 4, 1980 seeking $5145 is wholly inadequate to support the request. It does not contain sufficient detail to make a determination of the reasonable time spent and it is lacking in any statement of the hourly rates. Expenses for this period are also denied, as they consist of overnight express charges.

### KEYWELL & ROSENFELD

■ This law firm was appointed on December 4, 1979 as special counsel to the Trustee in connection with the so-called "Pine Knob mortgage" which CMIT held, worth approximately $3,750,000. Pine Knob was in Chapter XI proceedings, and CMIT participated in the case as a secured creditor. CMIT was relatively assured of payment on its secured claim, as a trustee's liquidating plan was approved. Keywell & Rosenfeld also represented the Trustee concerning problems with the Shenandoah Condominiums and The Northeast Condominium project. To date the firm has been paid $147,694.27 in interim awards out of requests totalling $153,379.65. The firm currently requests an additional sum of $27,344.72, representing amounts withheld from prior applications, and for services rendered from December 1982 to March 1983. The interim allowances are hereby confirmed, as I believe the compensation to have been fair. As for the supplemental request, the number of hours spent appears reasonable, but the average hourly rate of $120 is excessive. Much of the work performed was accomplished by way of telecommunication, which I will not compensate at such a high hourly charge. The supplemental request is allowed in the amount of $16,586.25. Keywell seeks $2079.60 for expenses for the final period of services. Of the items detailed, certain charges for duplicating, postage, and parking are disallowed as excessive and expenses shall be reimbursed in the amount of $1395.50.

### MEISSNER, TIERNEY, EHLINGER, & WHIPP, S.C.

(formerly Hoyt, Greene, & Meissner, S.C.)

■ This firm was employed as Special Counsel to the Chapter X Trustee from January 1979 concerning the Madison Hill Bankruptcy. To date they have been paid $278,732.25 as compensation and $12,469.97 for expenses. These awards are hereby confirmed because the time was spent effi-

ciently and the hourly rates were reasonable. During the period from April 1983 to September 1983 they seek $26,940 for services and expenses. The full amount requested shall be allowed. The hourly rates, ranging from $66 to $100, are fair and reasonable. Expenses of $15,487.43 shall be reimbursed.

## HANDMAKER, WEBER, MEYER & ROSE

This firm was employed as Special Counsel to the Chapter X Trustee from 1978 to 1981. They seek total compensation of $97,806.53, $74,565.50 of which has been paid. Therefore the firm seeks $10,158 in withheld compensation. Of this, they are allowed an additional amount of $8003.50. The application seeking compensation for projected work is without basis and is denied.

## HOLLAND & KNIGHT

This firm served as Special Counsel to the Chapter X Trustee. In December 1981, it received an interim fee award of $2641 and $369.69 for reimbursement of expenses. The firm has filed two fee applications, which are in large part duplicative. The first, dated March 7, 1983, seeks compensation of $1274 and $34.49 for expenses for the period of March 1982 to March 1983. The second application covers the same period, but requests an additional $355.50. Because of the duplication, I will consider only the second application.

Of the request for $1629.50, I allow $1300. The reason for the decrease is that the entries show excessive hourly rates for the nature of the work. For instance, on April 28, 1983, Attorney Wolff charged $125 for a one-half hour status conference.

Expenses shall be allowed in the amount of $74.21, as excessive charges for Federal Express and duplicating have been eliminated.

## SMITH AND MANDLER

This firm, Special Counsel to the Chapter X Trustee, seeks a $15,797.77 fee for services rendered in connection with a request for a 1978 real estate tax abatement for the debtor's El Cid Apartments. $10,000 has been paid to date. This interim award is confirmed and the balance of $5797.77 is hereby allowed.

## GUNSTER, YOAKLEY, RISER & STEWART

This firm served as Special Counsel to the Chapter X Trustee in connection with problems arising out of the construction of and sales of the Debtor's "Fairways" Condominiums. They have been paid $19,400.28 to date in interim fee allowances.

Three fee applications remain outstanding. The Application dated December 21, 1982 seeks $1140.50 for services rendered and $33.19 for expenses incurred (less a $5.00 credit) during the period of August to November 1982. Actual hours spent are listed as twelve. The applicant's submissions in support of this and all their applications are insufficient to enable the Court to assess the requisite factors to determine the reasonableness of time spent. Many of the entries do not detail the subject matter of work performed. Accordingly, the allowable time based on this application has been reduced to nine hours. The two attorneys who worked on CMIT matters billed $160 and $125 per hour. This is excessive for several reasons. Most of the work was done in telephone conferences. The skill required was minimal in these real estate matters. Moreover, the attorney billing $125 was a 1980 graduate, and the attorney billing $160 has only been a lawyer for nine years. The applicant has not justified such high hourly rates. A mixed hourly rate of $100 is reasonable. On the first application, compensation is allowed in the amount of $900, and expenses shall be allowed in the amount of $68.81.

Gunster's second application seeks $3002 for services and $99.07 for expenses for the period from December 1982 to February 1983. Again, the itemization of services is deficient and the hourly rates excessive given the nature of the work. Compensation is allowed in the amount of $1576, and $99.07 in expenses shall be reimbursed.

In the final application, the firm seeks a total of $2516 for services and $86.96 for expenses. Of this request $647.55 is sought for services rendered from June through October 1983, and the balance represents amounts withheld from prior applications. The prior awards are hereby ratified. An additional amount shall be allowed of $647.55 for services from June to October 1983, and expenses of $86.96 shall be reimbursed.

## LEWIS, RICE, TUCKER, ALLEN & CHUBB

■ This firm, which was employed as Special Counsel to the Trustee, seeks confirmation of nine interim allowances. The interim awards of $21,139.85 are hereby confirmed as final allowances.

## ARENT, FOX, KINTHER, PLOTKIN & KAHN

■ This firm served as Special Counsel to the Chapter X Trustee. Its application seeking confirmation of the prior awards and for an additional $600 is allowed.

## LAW OFFICE OF FREDERICK W. DRAKESMITH

■ The application of this attorney who served as Special Counsel to the Trustee is allowed in the amount of $330.

## COLDWELL, PACETTI, BARROW & SALISBURY

The application seeking confirmation of allowances made in 1979, 1980, and 1981 is allowed.

## LUCAS, PRENDERGAST, ALBRIGHT, GIBSON & NEWMAN

■ This firm was employed as Special Counsel to the Trustee. Its application seeking ratification of prior and an additional sum of $635 is allowed.

## COOPERS & LYBRAND

■ This accounting firm has been employed as accountant to the Chapter X Trustee since February 7, 1979. It prepared the Trustee's tax returns, examined financial statements, and assisted the Trustee in his section 167 report. To date, the firm has been paid $449,296.96 in interim awards, requests having amounted to $450,605.92. The current application seeks $1309 for the amount withheld from a 1981 interim application and $29,247 for services rendered from April to October 1983. The November 1981 disallowance of $1309 shall stand, and the interim allowances are confirmed. The final application is allowed to the extent of $28,962 for compensation and $285 for expenses.

## MOULTON & LOONEY

Moulton & Looney seeks total compensation of $270,081.88 for legal services and $35,519.25 for expenses as Special Counsel to the Indenture Trustee from April 1981 to October 1983. For services from April 1981 to December 1982 they seek compensation of $242,156.25 and request a bonus of $24,215.63. For the period from January 1983 to October 1983 the firm seeks $4430 in compensation. No interim awards have been paid.

Moulton & Looney represented Chemical Bank, the Indenture Trustee, in the equitable subordination litigation against the Senior Bank creditors. In this litigation, the Indenture Trustee had sought to subordinate the banks' claims for approximately $63,000,000. The banks' claims were compromised in September 1982 for $56,225,000, after notice and a hearing.

The total time spent according to Moulton & Looney's time records was three thousand two hundred and ninety hours (3290). According to their supplemental application fifty-seven hours were spent during the period from February 1, 1983 through October 1983. The time spent during the period of the supplemental application was unnecessary to further the litigation and was of no benefit to the estate. A review of the time records shows that most of the time was devoted to preparation of the fee application, and research on fee allowances, which are not compensable services. Accordingly, I will reduce the hours reasonably expended to 3221.75.

Moulton & Looney's average mixed hourly rate over the course of the case was $75 which I find reasonable. The case presented three legally and factually complicated questions concerning the banks' involvement in CMIT's management and the banks' asserted interest rate. Moreover, Moulton & Looney was under great pressure to conclude the litigation when appointed because the Court shortened the discovery period. In view of this, the case required a substantial commitment of time, labor, and skill. The request for a bonus is denied because the results obtained were not exceptional. The banks waived their claim for interest and attorneys' fees only. Chemical Bank paid the law firm regularly, thus there was no delay in payment. Compensation shall be allowed in the amount of $242,156.25. Moulton & Looney's expenses appear to be proper and within reason and shall be reimbursed in the amount of $35,143.99.

## CRAVATH, SWAINE, & MOORE

This law firm, general counsel to Chemical Bank, the Indenture Trustee, seeks compensation for services of $28,350 and reimbursement of $741.72 in expenses.

Actual time spent by the firm was 222.25 hours. These hours are excessive. One third of their time was totally unnecessary and duplicative. The firm continued to monitor these proceedings for its client Chemical Bank while Nutter, McClennen & Fish had already been hired as local counsel for the same purpose. Accordingly, I will reduce the firm's allowable hours to one-hundred and fifty.

The firm requests compensation at an average hourly rate of $127.56. This is excessive where their work consisted, in large part, of monitoring the proceedings. The firm also charges the full hourly rate for luncheon meetings, which is inappropriate. A reasonable hourly rate relecting the routine nature of their work is $75 per hour. Accordingly, compensation for services rendered is allowed in the amount of $11,250.00. Expenses shall be allowed in the amount of $110.30. The request of $741.72 has been reduced because it includes charges of $159.24 for overtime, $65 for carriers, and $298.36 for "miscellaneous" expenses, which is tantamount to an undocumented expense.

## NUTTER, McCLENNEN & FISH

Nutter, McClennen & Fish, general counsel to Chemical Bank, Indenture Trustee, seeks a total of $89,773 for legal services and $7339.64 for expenses. The first application covers the period from the filing date through January 31, 1983 and seeks $83,184 for services and $6137.66 for expenses. The second application seeks $6589 for services and $1201.98 for expenses for the period from February 21, 1983 to October 5, 1983. Any time spent during the period from February 1983 through October 1983 as set forth in the supplemental fee application is disallowed. Two thirds of the time recorded was spent preparing the application for fees. The remainder of time I consider to have been unnecessary because it consisted of monitoring and reviewing the progress of the proposed modification and the status of the case. From 1978 to 1983 the firm spent 1147.5 additional hours. This has been reduced to a more reasonable time basis of nine-hundred hours because of the firm's unnecessary and duplicative work in representing the bank in the equitable subordination controversy. Chemical Bank was represented by Moulton & Looney in that dispute.

Nutter, McClennen & Fish's mixed hourly rate of $72 is reasonable. The firm contributed its position to important issues such as notice, liquidation, and management of retained assets. As a final allowance, they shall be awarded $65,456.50.

Reimbursement of expenses is requested in the amount of $6,137.66 for 1978 to 1983. Charges for "messenger", "special steno", "travel", and "Lexis" have been eliminated as overhead items. Copying charges appear excessive and I have reduced the charges by one-half. For 1978 to 1983, I allow expenses of $3248.75. Similarly, for 1983 I have eliminated the afore-mentioned overhead charges, and the allowance of ex-

penses for this period is $351.87. The total expense reimbursement shall be $3600.62.

## CHEMICAL BANK

█ The two fee applications of the Indenture Trustee seek a $77,000 fee and $5240 for expenses. In its capacity as Indenture Trustee, Chemical Bank acted on behalf of subordinated noteholders. It requests compensation for routine administrative services and "special services" consisting of one-thousand one hundred and twenty-five (1125) hours of work by its officer.

The application does not document the hours spent but merely estimates that the officer spent one hour per day for five years working on CMIT matters. The bank has not submitted any record of actual time spent and its allegation that it expended over one thousand hours is undocumented. I will allow the Indenture Trustee compensation for nine hundred hours.

Chemical Bank seeks payment at an hourly rate of approximately $53 per hour. This is excessive for the administrative services performed, such as maintaining records and communicating with noteholders. In fact, Chemical concedes that its customary annual charge for such work is $3,000. Such an hourly rate is also not warranted for the services that Chemical Bank refers to as "extra-ordinary", in acting on behalf of the noteholders in the litigation and in reviewing plan proposals and modifications. In participating in the bankruptcy proceedings, Chemical Bank was acting as a client, not as a legal representative. It cannot properly claim compensation for lawyer's work such as reviewing pleadings or researching legal questions. Moreover, the officer and his staff were salaried employees and not usually paid on an hourly basis. Because the Indenture Trustee contributed to the estate in its participation on behalf of noteholders, I will allow total compensation in the amount of $40,500. Expenses requested are merely estimated. I will permit reimbursement in the amount of $2520.

## BADER & BADER

█ This firm acted as Counsel to the "Ad Hoc Noteholders Protective Committee" and seeks an allowance of $450,000 and expenses of $26,885. The application further seeks $20,854 to reimburse an accountant the firm had hired.

The initial application reflects two thousand and eleven (2011) hours of actual time spent and (300) hours of unrecorded time. The supplement records additional time of one hundred sixteen (116) hours spent. The request for payment for three hundred (300) hours of undocumented time violates a cardinal rule governing fee awards; accurate time records must substantiate a fee request. The absence of time records compels reduction. See In Re R. Hoe & Co., Inc., 471 F.Supp. 493 (S.D.N.Y.1978). A review of the time records also leads to the conclusion that time was spent unnecessarily. Time spent on numerous routine tasks appears excessive. Also, Mr. Bader's presence at many court hearings was unnecessary. In light of these facts, Bader & Bader's allowable time shall be reduced to one thousand (1000) hours.

Bader & Bader's requested hourly rate of $150 is excessive. The firm improperly bills the full hourly rate for travel time which is allowable only at a reduced rate. See Maceira v. Pagan, 698 F.2d 38 (1st Cir.1983). The firm improperly charges the full hourly rate for research, which is compensable at a lesser rate. Finally, the services rendered by Bader & Bader had negative aspects. During the first two years of their participation during my tenure their services were of little benefit to the parties, the clients, and the court. During the remainder of the case their participation was purely behind the scenes. Accordingly, I allow Bader & Bader an hourly rate of $100 and total compensation of $100,000.

The firm's expenses are, in large part, undocumented and unsubstantiated. The services of the auditor hired by Bader & Bader shall not be compensated from the estate. This individual must be considered an agent or employee of the law firm. Reimbursement of expenses shall be allowed in the amount of $5,600.

## A. LEIGH BAIER

■ Mr. Baier seeks $208,962.50 for legal services and $61,586.36 for expenses as first counsel to the Ad Hoc Protective Noteholders committee. Mr. Baier's actual time spent cannot be considered time reasonably expended. Numerous hours were spent on tasks unrelated to the representation of his client. Indeed, Baier need not have expended the quantity of time assisting the Trustee's Counsel in his Section 167 investigation, or in the Trustee's litigation. To the extent he duplicated services required of the Trustee and his counsel, he is not entitled to compensation. *See In Re Coast Investors, Inc.,* 388 F.2d 622 (9th Cir.1968). Based upon a review of Baier's time records, the reasonable amount of hours is one-thousand three hundred and seventy three (1973).

Baier's requested hourly rate of $150 is objectionable. Baier's involvement was limited to the early stages of the case during 1979 through 1981. Such a high rate is inappropriate for services rendered three to five years ago. Moreover, this uniform rate is charged for routine services, such as observing depositions, travel, and legal research. Some of Attorney Baier's work was of benefit to the estate, particularly, his discovery of a substantial preferential transfer. Accordingly, he shall be allowed a mixed hourly rate of $100, for a total fee award of $137,320.

Attorney Baier's request for expenses contains non-compensable items totalling $32,917.85 for car rentals, lunches, miscellaneous expenses, for unnecessary copies of depositions, and unnecessary photocopies. Expenses shall be reimbursed in the amount of $28,668.51.

## SEYMOUR LICHT

■ Seymour Licht, as Chairman of the Ad Hoc Noteholders Committee and a noteholder, seeks an allowance for services of $62,100 and expenses of $10,475. He also seeks reimbursement of $12,072.16 in expenses on behalf of the Committee. On November 29, 1983 Licht sent the Court a Western Union Mailgram withdrawing his own fee request. Another Mailgram was sent to the Court dated January 25, 1984 requesting reinstatement of his application.

First, I will consider Mr. Licht's fee request. He seeks compensation for twelve hundred (1200) hours at a rate of $50 per hour. His time spent is undocumented except for travel time, but he nonetheless seeks the full hourly rate for travel. I must disagree with Mr. Licht's claim that his services benefited the estate. It was clear to me that his involvement was solely in his self-interest in order to maximize his investment in CMIT notes. Indeed, many of his acts of opposition were obstructionist and for the purpose of delaying the proceedings. Accordingly, I deny him any compensation or reimbursement of expenses.

The additional request for $12072.16 is unsubstantiated to the extent of $3,000. Therefore, I allow reimbursement of committee expenses in the amount of $9,000.

## HALE & DORR

■ Hale and Dorr seeks $61,451.60 for legal services as counsel to the debtor from 1978 to 1982 and $3863.73 for expenses. They have already been paid $60,000 as a retainer prior to the filing.

The majority of time expended by Hale & Dorr appears reasonable. Its services included advising the debtor of its options prior to the filing, familiarizing the Trustee and his counsel with the affairs and operations of CMIT, attempting a reorganization, and drafting a plan. I have disallowed, however, forty hours of services which were rendered primarily in the interest of and for the personal benefit of CMIT officers, trustee, and shareholders, and time spent for preparation of the fee application.

Hale & Dorr's requested hourly rate for lawyers ranges from $60 to $175. There was an efficient division of labor and I find the rates reasonable. Compensation is allowed in the amount of $58,750.60. Expenses are allowed in the amount of $710.26. I have denied reimbursement of $3128.10 which is the amount of charges for messengers, travel, meals, and photocopy-

ing, the purposes of which are unsubstantiated.

## HUGH MAGUIRE

█ Hugh Maguire, a noteholder, seeks compensation of $73,310 and reimbursement of $4738 in expenses. In his first application, Maguire states that he spent nine hundred and six (906) hours in meetings between the Noteholders Committee and the Senior Banks, in soliciting offers to purchase CMIT's mortgage portfolio from 1981 to 1983. In his supplemental application he seeks an additional amount of $5360 for time spent during March through August 1983. Maguire generally documents his activities for the time period of the first application, but he provides a mere estimate of his hours expended. My review of his submissions leads to the conclusion that the major part of Maguire's work during this period was for his personal benefit as a noteholder, and was not pursued in the interests of the estate. Maguire does deserve compensation, however, for his work in promoting the sale of CMIT's mortgage portfolio, and therefore compensation of $4640 is allowed. Expenses incurred during the period of the first application are largely unsubstantiated. I will allow $1970 for Maguire's travel expenses. In his second application, Maguire's requested compensation shall be allowed in the amount of $5360, and his expenses of $1703 shall be reimbursed.

## GASTON SNOW & ELY BARTLETT

█ "Gaston Snow" seeks compensation of $56,022.00 and reimbursement of $3120.25 for expenses. This firm represented Hugh Maguire, a noteholder, in this proceeding from February through October 1983. Principally, its services consisted of objecting to the ballots concerning the Phelps Modification and objecting to confirmation of the modified plan. Ultimately, Maguire obtained appointment to the CMIT Board and the proposed modification was allowed by the Court.

Gaston Snow submits that its attorneys and paralegals spent 583.45 hours. Ten of its attorneys were assigned to CMIT. A review of the narrative attached to the application reveals considerable time spent in attorney conferences between members and associates. Moreover, it appears that much work was performed for the primary benefit and in the self-interest of Maguire. Accordingly, I have reduced Gaston Snow's allowable hours to four-hundred and eighty.

The mixed hourly rate sought by Gaston Snows attorneys is $115 per hour. Paralegals seek compensation at the rate of $45 and $40 per hour. These rates are excessive in view of the nature of the legal services rendered. Although the dispute over the balloting took considerable time, the issues can hardly be characterized as novel or difficult questions, requiring attorneys' skills. Gaston, Snows' ultimate settlement of the dispute did contribute to confirmation of the modified plan. It is my determination a reasonable mixed hourly rate for the attorneys is $95 per hour and for the paralegals is $20 per hour. Accordingly, Gaston Snow is allowed $46,411.50 compensation for their services.

For expenses, Gaston, Snow seeks reimbursement of $3620.25. The itemization includes a $900.49 charge for word processing which is not allowable because it is overhead. Gaston Snow's travel expense is not reimbursable as there is no documentation substantiating the necessity for travel. I have allowed reimbursement of xeroxing in the amount of $413.16. Expenses are allowed in the amount of $1107.90.

## GOODWIN, PROCTOR & HOAR

█ "Goodwin, Proctor" has represented Stanford N. Phelps in connection with the proposed Modification to the Trustee's Amended Liquidation Plan since September 1982. They seek compensation of $76,800 for services and $6091.46 for expenses.

Goodwin Proctor's services included preparation of the modification, disclosure materials, negotiations with noteholders, solicitation of ballots, preparation for and attendance at the various hearings on acceptance and confirmation, and opposition to compromise of the Trustee's litigation. Their time records show 702.20 hours were spent in

rendering these services. Their time actually spent seems reasonable and efficient. The records disclose neither the expenditure of unnecessary time nor the duplication of effort.

Goodwin, Proctor's hourly rates range from $90 to $160. Their average hourly rate of compensation according to the application is approximately $120. While the nature of much of their work was difficult and complicated (such as drafting the modification and disclosure statement), other work, such as review of pleadings, legal research, and inter-attorney conferences should not be so highly compensated. A more reasonable average hourly rate in, my opinion, is $103 per hour. The paralegal hourly rate I find unreasonable, and will allow $20 per hour of paralegal time. Goodwin Proctor shall be allowed compensation in the amount of $61,692.50.

Expenses shall be reimbursed in the amount of $2173.09. Charges for deliveries, travel time and secretarial time have been disallowed. Charges for duplicating have been reduced by fifty per cent. I have allowed reimbursement in full for postage and toll calls.

## REFEREE'S SALARY & EXPENSE FUND

Section 241(1) of the Bankruptcy Act of 1898 authorized the judge to "allow reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred in a proceeding under this Chapter—(1) by a referee; . . . . such compensation of referees shall not be governed by Section 40 . . . . of this Act." In Chapter X, reasonable compensation is the basis of the assessment; there are no specified formula or percentage rates as in straight bankruptcy or Chapter XI. *J. Moore, 6A Collier On Bankruptcy,* Par. 13.-03(2), at 555–57 (14th ed. Supp.1982).

The decided cases have determined that reasonable compensation to the referee is based on a reasonable hourly rate, according to the referee's salary, multiplied by the time spent in performance of the referee's duties. *Compare GAC Corp.,* 14 B.R. 1020, 1021 (Bkrtcy.S.D.Fla.1981) ($44,000 based on 2200 hours at $20 per hour) with *In Re Pacific Homes,* 20 B.R. 729, 752 (Bkrtcy.S.D. Cal.1982) ($70,000 for five years work on a complicated Chapter X case involving nursing homes with 1800 patients). Where a Chapter X case is referred to the Bankruptcy Judge, compensation to the Referee's Salary and Expense Fund is a matter for the Bankruptcy Judge to determine. *See J. Moore, 6A Collier On Bankruptcy,* Section 1303, at 555–57 (14th ed. 1982).

This Chapter X case was referred to me in October 1979. The debtor had assets of $60,000,000 throughout the United States, had ten thousand shareholders, and nearly two thousand bondholders. To say that this was a challenging case is an understatement. In addition, more often than not, the disputes among the various interests required a very active role by the Court. In reviewing the records, it is my conservative opinion that this proceeding consumed approximately ten per cent (10%) of the Court's time over the past four and one half years, or 200 hours per year. The average salary of a bankruptcy judge during this period was $55,000. Considering these factors, reasonable allowance to the Referee's Salary and Expense Fund is $24,750. The special expenses and costs of the Clerk of the Bankruptcy Court must be added to this amount. Based upon the manner in which the parties mailed notices, it is difficult to determine accurately the actual amount of expenses incurred. Therefore, employing $.25 per notice as the standard cost, it is estimated that the cost of mailings of nine notices to the notice list in this case was $11,250. Accordingly, the total amount to be paid to the Referee's Salary & Expense Fund is $36,000.